IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

SENORA L. BOLARINWA,

                    Petitioner,              Civil Action No.
                                             9:07-CV-1113 (LEK/DEP)

          v.

SABINA KAPLAN, Superintendent,

                    Respondent.
_____

APPEARANCES:                      OF COUNSEL:

FOR PETITIONER:

SENORA L. BOLARINWA, *Pro Se*
97-G-0584
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, NY 10507

FOR RESPONDENT:

HON. ERIC T. SCHNEIDERMAN         ASHLYN H. DANNELLY, ESQ.
New York State Attorney General   Assistant Attorney General
120 Broadway
New York, NY 10271

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Petitioner Senora L. Bolarinwa, a New York State prison inmate as a

1

result of a 1997 murder conviction for the killing of her son, commenced

this proceeding in August 2007 – nearly seven years after her conviction

became final for purposes of the controlling one-year statute of limitations

– seeking federal habeas relief from this court pursuant to 28 U.S.C. §

2254.  Following an initial review of Bolarinwa's petition and

accompanying *in forma pauperis* application, the petition was dismissed

by the court as facially untimely.  That dismissal was later overturned on

appeal, however, and the matter has been remanded to this court for

consideration of whether plaintiff's chronicled mental illness could provide

a basis to invoke equitable tolling and salvage her otherwise untimely

habeas claims.

Following the remand the petitioner was afforded an opportunity to

develop the record regarding her mental illness, and has since supplied

some, though not all, of the medical records concerning her mental health

care and treatment.  A review of the materials now before the court

reflects that although the petitioner undeniably suffers from a mental

illness, and her condition has resulted in occasional brief periods of in-

patient treatment, for the most part she has functioned normally in a

general prison population setting over the seven years that elapsed

between the date upon which her conviction became final and the

commencement of this proceeding, undertaking college courses and

pursuing two separate state court collateral challenges to her conviction.

Having carefully examined the records submitted by the petitioner

relating to the treatment of her mental condition, I conclude that she has

failed to carry her burden of establishing a basis to invoke equitable tolling

for the seven-year period necessary to resuscitate her otherwise untimely

petition, and therefore recommend that it once again be dismissed.

I.   BACKGROUND

Petitioner was charged with second degree murder and first degree

manslaughter in violation of New York Penal Law §§ 125.25(4) and

125.20(4), respectively, based upon the July 1995 drowning death of her

son.  *People v. Bolarinwa*, 258 A.D.2d 827, 687 N.Y.S.2d 442 (3d Dep't

1999).  On August 9, 1995, prior to trial on the two charges, a hearing was

conducted by the trial court pursuant to New York Criminal Procedure Law

("CPL") Article 730 to determine Bolarinwa's competency to stand trial.

*See* State Court Records (Dkt. No. 52) Exh. A.  Following the hearing,

during which two examining psychologists agreed that she was not

competent to proceed to trial, the court adjudicated Bolarinwa to be an

incapacitated person pursuant to CPL § 730.10, and ordered her to be committed for rehabilitation purposes for a period of up to one year.  *See id.* at p. 83.

In February 1996, following six months of treatment at the Mid-Hudson Psychiatric Center (the "Center"), petitioner was examined by Dr. Muthaiah Chandrasekhara, a psychiatrist, who concluded that she had been sufficiently rehabilitated such that she was then fit to proceed to trial. *See* State Court Records (Dkt. No. 52) Exh. B.  Petitioner was subsequently discharged from the Center on March 27, 1996, and was returned to Albany to face the pending charges against her.  *Id.* at Exhs. C and D.

Following hearings to address petitioner's motion to suppress evidence, including statements made to law enforcement personnel, a jury trial was convened before Albany County Court Judge Larry Rosen, beginning on February 4, 1997, to address the charges lodged against her.  *See* State Court Records (Dkt. No. 52) Trial Transcript.  At the close of the trial Bolarinwa was convicted of second degree murder, the jury having rejected her defense of not being criminally responsible for her son's death by reason of mental disease or defect.  *Id.*  Petitioner was

4

subsequently sentenced on April 4, 1997 to an indeterminate period of incarceration of between twenty-five years and life.  *See* State Court Records (Dkt. No. 52) Sentencing Transcript.

Petitioner appealed her conviction to the New York State Supreme Court Appellate Division, Third Judicial Department, arguing that 1) the trial court erred in admitting incriminating statements made by her to law enforcement officers, 2) evidence of petitioner's prior bad acts, including testimony regarding previous charges of child neglect and an attack upon her husband, were improperly admitted; 3) the trial court erred in not *sua sponte* ordering a further competency hearing; and 4) the verdict was against the weight of the evidence.  *See People v. Bolarinwa*, 258 A.D.2d 827, 687 N.Y.S.2d 442 (3d Dep't 1999).  Those arguments were rejected by the Third Department, which unanimously affirmed her conviction on February 25, 1999.  *Id.* Leave to appeal to the New York Court of Appeals was subsequently denied on August 12, 1999.  *People v. Bolarinwa,* 93 N.Y.2d 1014, 697 N.Y.S.2d 573 (1999).

On July 11, 2006, petitioner filed a *pro se* motion in Albany County Court to vacate her judgment of conviction, pursuant to CPL § 440.10. *See* State Court Records (Dkt. No. 52) Exh. H.  That motion was based

5

both upon recent decisions from the New York Court of Appeals regarding depraved indifference murder and Bolarinwa's claim that a juror may have been sleeping during her trial. *Id.* That motion was denied by decision issued by Albany County Court Judge Stephen W. Herrick on August 12, 2006. *Id.* Leave to appeal that determination was denied by the Third Department on September 22, 2006. *Id.* at Exh. I.

On January 4, 2007, again acting *pro se*, Bolarinwa petitioned the Third Department for a writ of error *coram nobis*, arguing that she was denied effective assistance of appellate counsel. State Records (Dkt. No. 52) Exh. J. That petition was denied by decision and order issued by that court on April 27, 2007. *Id.* at Exh. K. Leave to appeal that determination to the New York Court of Appeals was denied on June 28, 2007. *Id.* at Exh. L.

II.     PROCEDURAL HISTORY

Bolarinwa commenced this proceeding by filing a *pro se* petition, dated August 9, 2007, with the United States District Court for the Southern District of New York, seeking habeas relief from her state court conviction pursuant to 28 U.S.C. § 2254. Dkt. No. 1. In her petition, which is accompanied by forty-two pages of assorted attachments,

Bolarinwa raises a host of claims regarding her conviction.  *Id.*

Bolarinwa's petition was subsequently transferred to this court on October

2, 2007, based upon the fact that her conviction occurred within the

Northern District of New York.  Dkt. No. 3.

On November 14, 2007, after reviewing the petition and

accompanying motion for leave to proceed *in forma pauperis*, District

Judge Lawrence E. Kahn issued an order on November 14, 2007, in

which, *inter alia*, he questioned the timeliness of Bolarinwa's petition and

afforded her thirty days to demonstrate that her habeas claims are not

time-barred.  Dkt. No. 5.  Following receipt of the petitioner's submission

in response to that order, *see* Dkt. No. 6, District Judge Kahn issued an

order dated January 4, 2008, concluding that Bolarinwa's petition was in

fact untimely and directing its dismissal.  Dkt. No. 7.

Bolarinwa appealed the dismissal of her petition to the United States

Court of Appeals for the Second Circuit.  By decision dated January 28,

2010, the Second Circuit vacated the order dismissing her petition and

remanded the matter to this court for consideration of whether Bolarinwa's

mental illness presents a basis to invoke equitable tolling in order to

salvage her otherwise untimely habeas claims.  *See Bolarinwa v.*

*Williams*, 593 F.3d 226 (2d Cir. 2010).  By order dated March 4, 2010,

following issuance of the mandate in connection with that decision, *see*

Dkt. No. 78, this court's original dismissal order was vacated, and

petitioner was offered the opportunity to present evidence to support her

claim of equitable tolling.  Dkt. No. 24.  Petitioner has since submitted an

extensive affidavit and a supplemental affidavit, Dkt. Nos. 47, 48, as well

as various medical records, Dkt. No. 54, in support of her equitable tolling

claim.  The court has also received a memorandum on behalf of the

respondent in opposition to the petition, Dkt. No. 51, as well as relevant

state court records associated with petitioner's prosecution, including the

entire trial transcript.  Dkt. No. 52.

Bolarinwa's petition, including the issue of its timeliness, is now ripe

for determination and has been referred to me for the issuance of a report

and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

In 1996 Congress enacted the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214

(1996), bringing about sweeping reform of the prison inmate litigation

landscape.  The measures introduced by the AEDPA imposed significant new restrictions on the power of the federal courts to grant habeas relief to state court prisoners under 28 U.S.C. § 2254.  One such restriction resulted from creation of a one-year limitation period for filing such habeas petitions.  28 U.S.C. § 2244(d)(1); *Cook v. New York State Div. of Parole*, 321 F.3d 274, 279-80 (2d Cir. 2003).  The AEDPA statute of limitations "reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review."  *Duncan v. Walker*, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128 (2001).

The provision establishing the one-year limitation offers specific guidance regarding measurement of the prescribed period, providing that it

> shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  In this instance, the petitioner unsuccessfully pursued a direct appeal of her conviction to New York's initial appellate level court, and was thereafter denied leave to appeal to New York's highest court, the Court of Appeals.  The parties agree that under these circumstances her one-year period for seeking habeas review commenced running when the time for seeking *certiorari* review in the United States Supreme Court expired, or on or about November 12, 1999. *Gonazalez v. Thaler*, ___ U.S. ___, ___, 132 S. Ct. 641, 653-54 (2012); *Jimenez v. Quarterman*, 555 U.S. 113, 120, 129 S. Ct. 681 (2009); *Harper v. Ercole*, 648 F.3d 132, 135 (2d Cir. 2011).  Accordingly, absent a tolling of the governing statute of limitations, this proceeding, which was commenced in 2007, is time-barred.

One recognized ground for tolling the time to file a petition under section 2254 is the filing of a state court petition for collateral review.

10

Under the AEDPA the one-year governing limitation period is tolled during the pendency of a properly filed application for state post-conviction or other collateral review.  28 U.S.C. § 2244(d)(2); *see Lawrence v. Florida*, 549 U.S. 327, 329, 127 S. Ct. 1079, 1080 (2007).  This tolling provision

> balances the interests served by the exhaustion requirement and the limitation period.  Section 2244(d)(2) promotes the exhaustion of state remedies by protecting a state prisoner's ability later to apply for federal habeas relief while state remedies are being pursued.  At the same time, the provision limits the harm to the interest in finality by according tolling effect only to "properly filed application[s] for State post-conviction or other collateral review."

*Duncan*, 533 U.S. at 179-80, 121 S. Ct. at 2128.

It should be noted that this savings provision only operates to toll the statute of limitations during the pendency of a properly filed state court proceeding; it does not require resetting of the one-year clock or confer a new one-year limitation period upon conclusion of a state court collateral review proceeding qualifying under that provision.  *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *see also Bethea v. Girdich,* 293 F.3d 577, 578 (2d Cir. 2002).  When such a review proceeding is filed,

> the provision stops, but does not reset, the clock from ticking on the time in which to file a habeas petition.  It cannot revive a time period that has

11

> already expired.  To allow a belated state court
> collateral attack to revive the AEDPA limitations
> period would defeat the purpose of the AEDPA
> limit.

*Sorce v. Artuz*, 73 F. Supp. 2d 292, 294 (E.D.N.Y. 1999) (citing cases).

Because petitioner's CPL § 440.10 proceeding was only pending between

July and September of 2006, and her petition for a writ of error *coram*

*nobis* was pending between January 4, 2007 and June 28, 2007,

excluding only relatively nominal periods of time in comparison to the

relevant seven-year period, the tolling provision of section 2244(d)(2) does

not have a material impact upon the outcome in this case.

Another of the recognized bases for permitting a court's

consideration of the merits of an otherwise untimely petition under section

2254 is equitable tolling.  *Holland v. Florida*, ___ U.S. ___, 130 S. Ct.

2549, 2560 (2010); *Harper*, 648 F.3d at 136; *McGinnis*, 208 F.3d at 17;

*Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004), *cert. denied*, 546 U.S.

961, 126 S. Ct. 489 (2005).  Equitable tolling is a doctrine which the courts

have applied in "rare and exceptional circumstances" to toll the AEDPA's

limitation period.  *Menefee*, 391 F.3d 159; *see also Czernicki v. U.S. Dep't

of Justice*, 137 Fed. App'x 409, 410-11 (2d Cir. 2005) (cited in accordance

with Fed. R. App. P. 32.1).  To be eligible for equitable tolling, the

12

petitioner must show that she 1) has pursued her rights diligently, but 2)

has been prevented from making a timely filing by "extraordinary

circumstances".  *Holland*, 130 S. Ct. at 2562; *Pace v. DiGuglielmo*, 544

U.S. 408, 418, 125 S. Ct. 1807, 1814 (2005); *Harper,* 648 F.3d at 136.

The burden of satisfying the requirements for invoking equitable tolling

rests with the petitioner.  *Bolarinwa,* 593 F.3d at 232; *Boos v. Runyon*,

201 F.3d 178, 185 (2d Cir. 2000).

     The Second Circuit has held that mental illness can present the type

of rare and exceptional circumstance warranting a finding of equitable

tolling under appropriate circumstances, including in the context of habeas

petitions.  *Bolarinwa*, 593 F.3d at 231; *see also Boos,* 201 F.3d at 184-85

(holding that mental illness can provide a basis for tolling the time for a

federal employee to seek EEO counseling, as a prerequisite to

commencing an action).  The determination of whether the effects of a

litigant's mental illness are sufficient to support a finding of equitable

tolling is highly case specific, and requires the court to carefully examine

the particulars of the party's condition and how it has adversely affected

his or her ability to function generally or in relation to the pursuit of his or

her rights.  *Bolarinwa,* 593 F.3d at 232; *Boos*, 201 F.3d at 185.

When evaluating the petitioner's claim of extraordinary circumstances offered to support an equitable tolling argument, the court must look to the severity of the obstacle claimed as an impediment to the timely filing of a habeas petition, rather than the uniqueness of her circumstances.  *Harper,* 648 F.3d at 137; *Bolarinwa*, 593 F.3d at 231. The petitioner must also demonstrate a causal connection between the extraordinary circumstances claimed and the untimeliness of her filing. *Bolarinwa*, 593 F.3d at 231; *Harper,* 640 F.3d at 137; *Lago v. Niles,* No. CV-11-2083, 2012 WL373341, at * 2 (E.D.N.Y. Feb. 1, 2012).[1]

The diligence prong of the applicable test requires a showing that the petitioner has acted with "reasonable diligence."  *Harper*, 648 F.3d at 138.  Significantly, to qualify for equitable tolling the petitioner must demonstrate diligent pursuit of her habeas claims throughout the entire period for which tolling is sought.  *Harper,* 648 F.3d at 139.

When initially ordering dismissal of Bolarinwa's petition, this court did not have before it any information regarding petitioner's mental condition and corresponding treatment.  On appeal, the petitioner presented to the Second Circuit a letter from Eloise G. Warren, a licensed

---

[1]      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

clinical social worker ("LCSW") from the New York Office of Mental Health

("OMH"), summarizing Bolarinwa's condition as follows:

> Ms. Senora Bolarinwa has been a Mental Health
> patient since her arrival in the Correctional system.
> She has been treated for depression, PTSD, and
> intermittent explosive behavior.  Her treatment
> included Psychotherapy and Pharmocotherapy.
> Throughout treatment Ms. Bolarinwa [sic], stability
> has fluctuated over the years.  She has had
> difficulty accepting her lengthy sentence along with
> the losses of her three children who expired in
> 1995, 1999 and 2003.  During those times Ms.
> Bolarinwa spent her time in and out of the in-
> patient psychiatric facility, or in Satellite trying to
> become mentally stable.  Ms. Bolarinwa at the time
> was so aggravated and distracted by the tragic
> death of her children; it made it difficult for her to
> focus on filing a habeas petition. . . .

Motion Information Statement (Dkt. No. 11) Exhs. at p. 21 of 36.  LCSW

Warren's letter went on to state her belief that as of the time of the letter,

which is dated February 8, 2008, the petitioner had gained the requisite

stability to proceed. *Id.*

Following the remand of the matter to this court, at the court's

directive, in April 2010 plaintiff was provided with four hundred and five

pages of progress notes, psychiatric notes, and assessments regarding

her outpatient treatment. *See* Letter of Catherine McDermott, Psy. D. to

Ashlyn Dannelly, Esq., dated June 2, 2012 (Dkt. No. 41-1).  One month

later petitioner's primary therapist met with her and provided her copies of records of in-patient treatment received by her while at the Central New York Psychiatric Center ("CNYPC").

In support of her request for an equitable tolling finding, petitioner has submitted some, though not all, of those records.[2]  *See* Dkt. No. 54. For example, records associated with some years, including 1998 and 1999, are extremely limited, revealing psychiatric notes for only two or three days out of those entire years.  For other years, such as 1997 and 2001, the medical records submitted appear to be limited to psychiatric notes for a couple of months during those years.  Accordingly, these gaps have required the court to make certain assumptions and extrapolations concerning petitioner's overall mental health during the documented years.[3]

In general terms, as causal or contributing factors with respect to her mental condition petitioner offers the killing of her son; the suicide of

_____

[2]      The records offered by the petitioner are not well organized, and a significant number of the records submitted represent duplicate copies of the same pages.  To facilitate its analysis and appellate review, the court has reorganized the records in reverse chronological order by date of entry or treatment.

[3]      The summary which follows does not reference petitioner's medical records for the years 2008, 2009 and 2010, since they post-date the commencement of this proceeding and are therefore of limited or no relevance to the equitable tolling inquiry.

another son in 1998; her daughter's death in or about 2003, after suffering

from a lengthy illness; the losses of her father and grandfather in 2000

and 2004, respectively, as well as having experienced childhood abuse

and repeated incidents of domestic violence.  As a result of those

occurrences and other stressors, petitioner has been variously diagnosed

as suffering from depression and chronic post-traumatic stress disorder

("PTSD"), with suicidal ideation, and was admitted on four separate

occasions to the CNYPC for in-patient treatment, including 1) from

September 12, 1997 to November 24, 1998; 2) from February 24, 2000

until March 14, 2000; 3) between March 10, 2003 and April 10, 2003; and

4) from October 1, 2009 until January 12, 2010.[4]  *See* Dannelly Aff. (Dkt.

No. 46) Exh. C.  Records associated with petitioner's admissions include

global assessment of functioning ("GAF") scores which reflect a high level

ability to function, including on April 9, 2003 when a GAF of 70 was

reported.[5]

---

[4]        As can be seen, out of the 590 days of in-patient confinement,
petitioner's in-patient treatment during the relevant period between November 1999
and August 2007 extended only over a period of only fifty days out of the nearly seven-
years in question.

[5]        A GAF score between 61 and 70 reflects

> [s]ome mild symptoms (e.g., depressed mood and mild
> insomnia) OR some difficulty in social, occupational, or

In her recent submission, petitioner states that while she was able to attend work modules and take school classes throughout the relevant seven-year period, she was nonetheless incapable of dealing with the subject matter of this proceeding.  *See* Petitioner's Submission (Dkt. No. 47) at p. 92.  Bolarinwa states that during the tolling period she experienced various symptoms including having poor judgment, with impulsivity, being overly emotional, insomnia, lack of concentration, easily irritated, low tolerance for noise, too many colors, crowds and overly on-guard, overly sensitive, and lacking motivation.  *See id.*

An overall review of petitioner's mental health records somewhat confirms LSC Warren's assessment that Bolarinwa's condition fluctuated over the relevant time period.  For every year, with the exception of 2002 and 2006, petitioner appears to have experienced months during which she was stable, and exhibited good spirits, while at other times she struggled with depression and anxiety.  During 2002, and again in 2006, however, petitioner appears to have been stable, tutoring in the prison's

---

school functioning (e.g., occasional truancy, or theft within the household), generally functioning pretty well, has some meaningful interpersonal relationships.

Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") at p. 34 (4th ed. revised).

school, experiencing hopefulness concerning her case, and exhibiting an adequate self awareness and introspective.  A majority of petitioner's medical records, moreover, suggest a self-awareness of her situation and that she actively worked to better herself, even during times when she reported feeling depressed and/or overwhelmed.  Petitioner's medical records further reveal that she has been engaged in a constant struggle to cope with her weak family relationships, intense feelings of guilt over killing her son and the suicide of another son, and her own history of being sexually and physically abused.  These past traumas and current guilt appear to trigger periodic episodes of depression, anxiety, and psychosis.

The records additionally disclose that at times, in 2001, 2004, 2005, and 2007 petitioner's stability was compromised, most often when confronted with her usual stressors.  This notwithstanding, however, during those periods petitioner's medical records reflect that she was almost always able to work through her issues verbally with her psychiatrist, reflect on her growth, and express her dedication to improvement.  Among other things, the records reveal that petitioner reported being extremely focused and dedicated to completing her appeal during 2005 and 2006.

To be sure, petitioner has also suffered through difficult periods.  In 2000 and 2003 she was admitted to the psychiatric ward due to actively suicidal thoughts, depression, and a general inability to cope.  Petitioner also exhibited behavioral difficulties in 2004, consisting mainly of sexually promiscuous behavior, and culminating in an assault of a prison school teacher.  Following that assault Bolarinwa spent approximately ten months of disciplinary confinement in a facility special housing unit ("SHU") under observation from the end of 2004 through September 2005.  The following reflects a synopsis of petitioner's mental health treatment history between 2000 to the date of commencement of this proceeding:

| YEAR 2000 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 2/24/00 | Diagnosis upon admission: despondent and actively suicidal, Major Depressive Disorder<br>Petitioner made a seventh suicide attempt due to daughter's illness (daughter in a coma)<br>Mental status: adequate hygiene, low tone and volume of speech, unpredictable impulse control, suicidal/homicidal ideations<br>Thought process logical and organized, cooperative to admission process for in-patient therapy<br>Compliant with medication | Poorly/admitted to Ward 502 |
| 2/25/00 | No suicidal ideations or gestures<br>Good appetite<br>Cooperative to Ward routine | Equivocal |
| 2/28/00 | Took college courses towards sociology degree<br>Petitioner stated that she believes in the power of | Well |

20

| YEAR 2000 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| | prayer and is a protestant | |
| 3/14/00 | Discharged from Ward 502 after 19 days | Well |
| 11/27/00 | Petitioner in outpatient therapy Psychiatrist reported: "no functional impairment, [Petitioner] keeps busy & active to manage emotional stress" | Well |
| 12/11/00 | Petitioner shared ongoing thoughts of death, but denied suicidal ideations or plans | Equivocal |
| 12/20/00 | Petitioner's therapy sessions reduced to bi-monthly Petitioner reported functioning well enjoying her programs and expressed positive attitude toward treatment | Well |
| 12/22/00 | Petitioner only medicated 10% of the time because her medications had the appropriate and desired effects Petitioner reported feeling not depressed and felt as though did not need medication | Well |

| YEAR 2001 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 8/1/01 | Petitioner on no meds, in good mood and no thoughts of self-harm Good week: discussed ways of dealing and getting past the trauma in her life, as well as choices available in the future | Well |
| 8/21/01 | Petitioner demonstrated less control of thoughts – thoughts of anger and despair Mood was unstable and depressed, racing thoughts, disorganized laughter | Poorly |
| 9/10/01 | Discussed past pregnancies and feeling of being controlled by the men in her life | Equivocal |

| YEAR 2001 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 9/27/01 | Petitioner admitted to psychiatric "Dorm" for distress because overwhelmed with hopelessness and sadness<br>Thoughts consume her almost every free moment | Poorly/admitted to Dorm |
| 9/28/01 | Increased ability to cope with and manage anxiety<br>Discharged from Dorm into the prison's general population | Well |
| 10/4/01 | Petitioner had success in college courses, and shared ideas for future projects<br>No reported loss of contact with reality or any social withdrawal | Well |
| 10/23/01 | Petitioner reflected on insights gained over years due to tragedies in life<br>Expressed desire to document life in a book | Well |
| 11/1/01 | Psychiatrist reported: "[Petitioner's] mood remains generally positive despite sadness"<br>Petitioner had high functioning and productivity in her daily routine | Well |
| 11/15/01 through 11/28/01 | Petitioner reported improvements in her relationship with her family<br>Invested in programs because Petitioner finds them as strong sources of support and motivation to persevere | Well |
| 12/24/01 | Mixed feelings of sadness and joy around holidays<br>Petitioner reported being proud of herself for being assertive with peers | Well |

| YEAR 2002 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 1/18/02 | "Clinically stable and doing well" in outpatient therapy<br>Petitioner reports working on herself | Well |
| 2/1/02 | Feeling well despite family issues | Well |

| YEAR 2002 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|-----------|--------------------------------------|-----------------------|
| | | |
| 2/13/02 | Expressed high hopes in her son's future, and a need to guide him to do positive things<br>Petitioner doing well, no suicidal or harmful thoughts | Well |
| 3/6/02 | Petitioner upset, however reported improved mood after "she could vent to someone" | Well |
| 4/10/02 | Petitioner felt remorseful and isolated in jail, and continued to self-examine<br>Petitioner looking for her voice in the [rehabilitation] process | Well |
| 4/24/02 | Petitioner came to conclusion during therapy session that she has a place in the world because of her son<br>Petitioner wanted to share her advice and wisdom, and be open and honest with her son to guide him | Well |
| 5/14/02 | Petitioner trying to make things right in her life through her son | Well |
| 5/29/02 | Petitioner reports "having a good month"<br>Graduated from college courses, met her granddaughter, and all is going well | Well |
| 6/12/02 | After graduation, planned to take summer school classes<br>Petitioner "is hopeful, happy, and motivated." | Well |
| 7/3/02 | Petitioner continued to do well and was in good spirits | Well |
| 7/31/02 | Petitioner stressed from work, but coping appropriately and reported feeling better after session<br>No suicidal or homicidal ideations noted | Well |

23

| YEAR 2002 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 9/24/02 | Petitioner reported feeling accomplished and trying to correct her mistakes through her son "Pleasant and happy" | Well |
| 10/4/02 | Denied any current suicidal ideations Contracted for her safety | Well |
| 11/5/02 | Good spirit, hopeful, and focused on herself Acknowledged that certain things are out of her control Psychiatrist noted this acknowledgment was healthy for Petitioner's state of mind | Well |
| 12/16/02 | Excited about Christmas-time visit with son Petitioner attempting to let go of family-issues because they are out of her control | Well |

| YEAR 2003 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 1/14/03 | Petitioner reported being in a toxic relationship that she wanted to end | Well |
| 1/28/03 | In good spirits, tutoring GED inmates | Well |
| 2/5/03 through 2/10/03 | Admitted to "Dorm" – compliant and cooperative Admission related to learning about the death of her ex-husband and corresponding feelings of sadness and guilt | Poorly/admitted to Dorm |
| 2/14/03 | Reported inability to control emotions – felt in a "mixed manic" state Re-admitted to "Dorm" | Poorly/Dorm |
| 2/20/03 | Reported racing thoughts, decreased sleep, and easily agitated Intermittent suicidal ideations due to her prison sentence and feeling a lack of control Worsened mood, no sleep, increased feeling of isolation, and decreased sense of reality | Poorly/Dorm |

| YEAR 2003 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| | | |
| 2/27/03 | Reported intermittent suicidal ideations – remained in "Dorm" for observation | Poorly/Dorm |
| 3/3/03 | Stable mood without any affective/psychotic symptoms present<br>Reported having "restful weekend" | Better/Dorm |
| 3/10/03 | Admitted to Ward 102: diagnosed with Antisocial Personality Disorder<br>Reason: admitted after assaulting another inmate, was depressed, and demonstrated illogical thought process<br>Petitioner made multiple suicide attempts in the past and was depressed about murdering her son<br>Depressed, vegetative, poor sleep, lack of interest, guilty | Poorly, admitted to Ward 501 |
| 3/11/03 through 3/12/03 | Petitioner delusional<br>Obsessed with numbers and believed she was pregnant<br>Symptoms: giggled uncontrollably, appeared as if being tickled, unable to focus, wanted to shave her head | Poorly/Ward |
| 3/13/03 | Demonstrated symptoms of mild psychomotor retardation<br>Frequent episodes of tearfulness, anxiety, and guilt<br>Bizarre, disorganized, illogical thoughts | Poorly/Ward |
| 3/16/03 through 3/29/03 | Petitioner remained delusional, paranoid, agitated<br>Trauma of killing her son was continuous for her on daily basis<br>Reported hearing voices<br>Rambling, disorganized speech, frequent sadness | Poorly/Ward |
| 4/1/03 | Petitioner more coherent<br>Sobbing for her deceased children<br>Was able to develop coping strategies | Poorly/Ward |

| YEAR 2003 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 5/21/03 through 5/22/03 | Discussed self-awareness and knowing when to take a break from relationships<br>Demonstrated motivation to change<br>Shared relationship problems – loneliness superseding good judgment | Well |
| 7/8/03 through 7/22/03 | Petitioner reported reading scholarly articles for self-educational purpose<br>Taking up interests/activities to cope with her prison sentence and relationship<br>Psychiatrist reported that Petitioner talked with "passion and excitement," and "great zest"<br>Petitioner struggles with happy medium, has no middle ground | Well |
| 8/8/03 through 8/18/03 | Petitioner struggles with family patterns and disturbing letter received from niece<br>Reflected on being helpless to cycle of abuse in her family | Well |
| 9/19/03 | Taken off medications effective today | Well |
| 11/12/03 | Doing well, Petitioner has insight into problems<br>Actively involved in community and school<br>Learning music through playing the keyboard<br>Reports a positive outlook on life and hopes to prepare for the larger community in the future | Well |

| YEAR 2004 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 3/17/04 | Petitioner was in a relationship with another inmate and displayed sexually promiscuous behavior with a close friend and another inmate<br>Petitioner was in a self-destructive mood | Well, but unstable |
| 3/24/04 | Petitioner reported seeing and hearing her children in her head; her son that she killed and other children condemned her, voices came up from the ground<br>Petitioner felt that she did not deserve to be alive | Well, but unstable |

26

| YEAR 2004 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| | Denied suicidal ideations, but was deemed harmful to herself | |
| 3/31/04 through 4/1/04 | Petitioner reported feeling "hyper-sexual and [was] going to extremes to satisfy her needs," was sexually active with different inmates without protection<br>Continued to have hallucinations where her children were still talking to her | Well, but unstable |
| 4/19/04 | Improved mood and slowed sexual activity | Well |
| 7/1/04 | Petitioner having issues managing priorities | Well |
| 7/7/04 | Death of grandfather and aunt triggered feelings about "demise of [her] other children" | Poorly |
| 7/21/04 | Doing well but having irrational thoughts and increased sex drive<br>Psychiatrist advised Petitioner to "stay out of trouble with officers and other inmates" sexually | Well |
| 8/19/04 | Good spirits<br>"Currently stable and focused on writing an article for [Petitioner's] son" | Well |
| 9/8/04 | Anniversary of son's suicide caused Petitioner to feel overwhelmed and depressed<br>Petitioner still hopeful and lives through only living child<br>Petitioner reported "using school and sex as her outlet" | Well |
| 9/13/04 | Petitioner expressed desire to learn, study, and teach | Well |
| 9/22/04 | Feeling rebellious toward family<br>In a relationship with another prisoner at the jail | Well |
| 10/20/04 | Petitioner's relationship was abusive and she not doing well | Unstable |

| YEAR 2004 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| | However, discussed link between abusive and incestuous family background, and Petitioner's current relationships | |
| 11/2/04 | Petitioner coping with anger and helplessness<br>Petitioner able to recognize pattern of getting involved with abusive relationships | Well |
| 11/16/04 | Doing well despite depression over holidays | Well |
| 12/13/04 through 12/29/04 | Admitted to SHU for assaulting one of the teachers<br>Although Petitioner's thoughts were sometimes disorganized, "on the whole" her thoughts were linear<br>Petitioner contracted for her safety while in SHU<br>No suicidal or homicidal ideations, and no behavioral incidents | Well / admitted to SHU |

| YEAR 2005 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 1/14/05 through 2/4/05 | No symptoms of psychosis, no suicidal or homicidal ideations<br>Mood improved, reported "feeling better"<br>Petitioner was observed singing in cell | Well/SHU |
| 2/11/05 through 3/1/05 | Petitioner struggled with history of relationships and "life on the street"<br>Despite generally cheerful mood, also sad about son | Well/SHU |
| 4/15/05 through 4/29/05 | No symptoms of psychosis, no suicidal or homicidal ideations<br>Focused on legal appeal<br>Mood calm, discussed managing interpersonal conflict and self-expression | Well/SHU |
| 5/20/05 | Concentration on legal work, no psychosis | Well/SHU |
| 7/29/05 | No stressors in Petitioner's life noted | Well/SHU |

| YEAR 2005 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| | | |
| 9/29/05 | Petitioner "too immersed" in working on her appeal; psychiatrist requested that she take a break from it | Well |
| 10/13/05 | Good spirits<br>Petitioner in "MICA Unit" but felt that she did not need it<br>No major complaints, expressed desire for peace of mind | Well |
| 12/8/05 through 12/14/05 | Petitioner had bad memories at holidays<br>Stuck in past and struggled with moving on<br>On Dec. 14: placed in "Dorm" for making verbal threats to injure a civilian staff person | Unstable/Dorm |

| YEAR 2006 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 1/5/06 | Good spirits<br>Petitioner wants to help use her skills in the "112 Mica Unit" to help the program's success<br>Petitioner looking for a friend to talk to without a sexual relationship | Well |
| 2/9/06 | Petitioner running a group in the Unit and feeling good<br>Denied any "flashback" issues<br>Petitioner taking classes at school and tutoring, feels productive | Well |
| 3/16/06 | Petitioner reports that her case "keeps her going" and is hopeful about its outcome | Well |
| 3/30/06 | Doing well and in good spirits, reports minimal mood swings<br>Petitioner involved in a relationship that is "keeping her distracted" | Well |
| 5/18/06 | Reports being "very happy" because she is "out of | Well |

| YEAR 2006 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| | lock and able to keep [her] belongings" Petitioner has her own cell | |
| 6/5/06 | Petitioner is focused on her case, spent whole day reading her appeal and arguments Psychiatrist noted that Petitioner's feelings could not be assessed because she was so driven to complete the appeal Petitioner reported doing well | Well + working on her case |
| 6/19/06 | Completed her appeal and ready to send it in Reports good mood and "feeling satisfied" Petitioner uses activities to distract herself during stay in jail and has a relationship Psychiatrist noted that "overall Petitioner is stable" | Well |
| 7/24/06 | Petitioner in good spirits, focused on her case and confident that she will obtain a positive result Using coping skills [obtained through therapy sessions] to handle losses in her life | Well + working on her case |
| 11/27/06 | Petitioner in "keep lock" for fighting but reflected that she was upset with herself for not walking away Lacks ability to think about the consequences of her actions before acting | Well + self-aware |
| 12/19/06 | Petitioner remained in "keeplock" | Well |

| YEAR 2007 | PERTINENT FACTS FROM MEDICAL RECORDS | DOING WELL OR POORLY? |
|---|---|---|
| 1/23/07 | Petitioner expressed pain/resentment with difficulty fitting into prison life | Well |
| 2/13/07 | Petitioner in a better mood Concerned about her weight gain (+30 pounds) and potentially developing diabetes | Well |

| 3/23/07 | Petitioner referred to the Dorm because depressed and agitated, and Dorm helps her with these symptoms<br>No suicidal ideations | Poorly/Dorm |
|---------|---------|---------|
| 4/10/07 | Petitioner no longer in Dorm<br>Denied any current depression and seemed much calmer<br>Waiting for information on her case | Well |
| 5/8/07 | Good spirits after visit from son | Well |
| 6/18/07 | Petitioner not in good spirits, but is happy with son's regular visits<br>Expressed nervousness because her appeal's result is pending<br>Stated that she does not want to stay in jail for thirteen more years | Well |
| 7/6/07 | Medically stable but explosive personality<br>Petitioner recommended for admission to the Dorm for observation and her own safety | Poorly/Dorm |
| 7/24/07 | Expressed depression about thirteen more years in jail | Well |
| 8/14/07 | Petition for habeas corpus filed and finalized | N/A |

A review of petitioner's medical records reflect that on the whole, she was self-aware and dedicated to improving herself on a continuous basis during the relevant period.  This circumstance, particularly in view of her goal-oriented mentality, makes equitable tolling inappropriate in this case.  Many of petitioner's progress note entries reflect stability as well as her ability to interact socially, play cards, watch television, and engage in

other similar group activities within the prison setting.  *See*, *e.g.,* Progress Notes (Dkt. No. 54) p. 104 ("PT is doing well.  She continues to have good insight to her problem.  PT stays actively involved in committees & school. PT is learning music through her new keyboard.  PT tries to have a positive outlook in life and hopes that she can prepare herself for the larger community.") (11/12/03).   Petitioner appears to have contributed to the prison environment by working as tutor for GED students and occasionally leading group sessions of other students.  At times petitioner's insight into her background and thought process appears to have been highly introspective.  Despite her traumatic past, which serves as a constant stressor, Bolarinwa does not appear to have been so mentally handicapped over the entire seven-year period at issue as to require tolling of the statute of limitations.

These findings are buttressed by evidence of petitioner's legal pursuits during the relevant time period.  The record reflects that over time petitioner has been actively engaged in pursuit of legal claims on her own behalf.  In January 2000, for example, Bolarinwa wrote to her appellate counsel inquiring why she did not receive mail from her.  In response, counsel advised her of her right to file constitutional claims and offered to

assist her with those claims.  *See* Petition (Dkt. No. 1) Attachments at p.

12 of 50 (unnumbered).   In 2005, petitioner was able to conduct research,

as evidenced of the fact that she found "in the law book" a wrongful death

suit filed by her husband against her.  She was also able to conduct legal

research concerning a rebuttal witness offered by the prosecution against

her at trial, and the petition filed in this matter includes as attachments

results of computerized legal research conducted by her between April

and July of 2005.  *See* Dkt. No. 1.

Petitioner's ability to pursue legal claims during the relevant times is

confirmed by her filing of a CPL § 440.10 motion in July 2006, well prior to

preparing and mailing her habeas petition in August 2007.  In addition,

Bolarinwa completed and submitted a petition for writ of error *coram nobis*

in January 2007, again prior to commencement of this proceeding.

Based upon the foregoing, I conclude that the petitioner has failed to

sustain her burden of demonstrating the existence of extraordinary

circumstances covering the entire seven-year relevant period and a

causal connection between those circumstances and the lateness of her

habeas petition filing.  I also find that she has failed to demonstrate that

the symptoms associated with her mental health issues severely impaired

her ability to timely file a petition despite her diligent efforts to do so.[6]

IV.   SUMMARY AND RECOMMENDATION

Undeniably, petitioner's life has been marked with tragedy, leading her to suffer from well-chronicled and diagnosed mental conditions. Nonetheless, a careful review of the comprehensive medical records now before the court fails to support petitioner's contention that as a result of those and other stressors in her life she was subjected to extraordinary circumstances which prevented her, despite due diligence, over an entire seven-year period from filing a habeas petition. Accordingly, I recommend a finding that petitioner is not entitled to equitable tolling for the entire period in issue and that her petition therefore be dismissed as untimely.[7]

---

[6]      In making my recommendation I have considered the option of ordering an evidentiary hearing in order to flesh out the facts necessary to evaluate plaintiff's request for equitable tolling. *See Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003) (citing *Chang v. United States,* 250 F.3d 79, 85-86 (2d Cir. 2001)). Nonetheless, in view of the comprehensive nature of the records received by the court concerning petitioner's mental health treatment, the extreme length of time involved and the fact that the record now before the court fails to reflect evidence sufficient to support a claim of equitable tolling over the entire seven-year period involved, I find it unnecessary to conduct an evidentiary hearing. *See Valverde v. Stinson*, 224 F.3d 129, 135 (2d Cir. 2000) (quoting *United States v. Aiello*, 814 F.2d 109, 114 (2d Cir.1987) and citing cases)  (noting "'the district court, in its discretion, may utilize any of the habeas rules designed to supplement the record without the necessity of conducting a full-blown evidentiary hearing.'" )

[7]      Before recommending dismissal of Bolarinwa's petition on statute of limitations grounds, I have considered the question of actual innocence.  The Second Circuit has not yet staked out a formal position regarding whether the United States Constitution requires that an "actual innocence" exception be engrafted into the

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that the petition in this matter be DISMISSED, as untimely, and that petitioner's request for a finding of equitable tolling be REJECTED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of

_____

AEDPA's statute of limitations.  *See Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir. 2003); *Warren v. Artus*, Nos. 9:05-CV-1032, 2007 WL 1017112, at *9 (N.D.N.Y. Mar. 30, 2007( (Kahn, D.J. & Peebles, M.J.).  That court has nonetheless directed that district courts consider claim of actual innocence before dismissing a habeas petition as untimely.  *Id.; see also Menefee,* 391 F.3d at 161.

A showing of actual innocence requires more than merely arguing that the jury's finding of guilt is against the weight of the evidence; to establish actual innocence, a petitioner must present "new reliable evidence that was not presented at trial and show that it is more likely than not that no reasonable juror would have found him [or her] guilty beyond a reasonable doubt. *Whitley,* 317 F.3d at 2257; *see also Medina v. McGinnis*, No. 04 Civ. 2515, 2004 WL2088578, *27 (S.D.N.Y. Sept. 20, 2004).  In this instance, plaintiff has failed to come forward with any new evidence that was not adduced at trial that would provide support for actual innocence.  Moreover, the evidence of guilt adduced at trial was plentiful, and fully supports her statement to law enforcement officials to the extent that she killed her son.

this report and recommendation upon the parties in accordance with this

court's local rules.


_____
David E. Peebles
U.S. Magistrate Judge

Dated:   May 8, 2012
         Syracuse, NY



Slip Copy, 2012 WL 373341 (E.D.N.Y.)

(Cite as: 2012 WL 373341 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Joseph LAGO, Petitioner,
v.
Gene NILES, Acting Superintendent, Otisville
Correctional Facility, Respondent.
No. CV–11–2083.

Feb. 1, 2012.
Joseph Lago, Otisville, NY, pro se.

Anne E. Oh, Riverhead, NY, pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** On January 18, 2007, a judgment of conviction was entered against *pro se* petitioner Joseph Lago ("petitioner") in the Supreme Court of the State of New York, Suffolk County (Mullen, J.), upon a jury verdict finding him guilty of two (2) counts of manslaughter in the second degree, six (6) counts of vehicular manslaughter in the first degree, three (3) counts of vehicular assault in the first degree, three (3) counts of operating a motor vehicle while intoxicated, three (3) counts of aggravated unlicensed operation of a motor vehicle in the first degree, reckless driving and speeding, and upon imposition of sentence. On or about April 25, 2011, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the Court is respondent's motion to dismiss the petition as time-barred. For the reasons set forth herein, respondent's motion is granted and the petition is dismissed in its entirety with prejudice.

I. BACKGROUND

On January 18, 2007, a judgment of conviction was entered against petitioner in the Supreme Court of the State of New York, Suffolk County (Mullen, J.) ("the state

court"), upon a jury verdict finding him guilty of two (2) counts of manslaughter in the second degree, six (6) counts of vehicular manslaughter in the first degree, three (3) counts of vehicular assault in the first degree, three (3) counts of operating a motor vehicle while intoxicated, three (3) counts of aggravated unlicensed operation of a motor vehicle in the first degree, reckless driving and speeding, and upon imposition of sentence to, *inter alia,* concurrent indeterminate terms of imprisonment of five (5) to fifteen (15) years on the top counts.

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("the Appellate Division"). By order dated March 10, 2009, the Appellate Division affirmed the judgment of conviction. *People v. Lago,* 60 A.D.3d 784, 875 N.Y.S.2d 178 (2d Dept.2009). On August 11, 2009, the New York State Court of Appeals denied petitioner's application for leave to appeal the order of the Appellate Division. *People v. Lago,* 13 N.Y.3d 746, 886 N.Y.S.2d 100, 914 N.E.2d 1018 (2009). Thus, petitioner's judgment of conviction became final on November 9, 2009, when his time expired to seek direct review by writ of certiorari to the United States Supreme Court. *See* Rule 13(1) of the Rules of the Supreme Court of the United States; 28 U.S.C. § 2101(d); *Jimenez v. Quarterman,* 555 U.S. 113, 129 S.Ct. 681, 685–686, 172 L.Ed.2d 475 (2009).

On or about April 27, 2011, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent now moves to dismiss the petition as time-barred. Petitioner has not opposed the motion, although he asserts in his petition, in essence, that his failure to timely file the petition should be excused because his retained appellate counsel never advised him when his application for leave to appeal to the New York State Court of Appeals had been denied and he only learned of the denial of his application in March 2011.

II. DISCUSSION

**\*2** A petition for a writ of habeas corpus filed by a person in state custody is governed by the Antiterrorism

Slip Copy, 2012 WL 373341 (E.D.N.Y.)

(Cite as: 2012 WL 373341 (E.D.N.Y.))

and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA establishes a one (1)-year statute of limitations for state prisoners seeking federal habeas relief from a state court judgment. 28 U.S.C. § 2244(d)(1); *see Gonzalez v. Thaler,* ––– U.S. – – – –, ––– S.Ct. ––––, L.Ed.2d – – – –, 2012 WL 43513, at *9 (Jan. 10, 2012). Pursuant to the AEDPA, the limitations period runs

"from the latest of—(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

Only subparagraph (A) is applicable here, so petitioner's judgment became final on November 9, 2009, when his time for pursuing direct review in the Supreme Court expired. *See Gonzalez,* ––– U.S. – – – –, ––– S.Ct. ––––, ––– L.Ed.2d – – – –, 2012 WL 43513, at *9. Thus, pursuant to the AEDPA, petitioner had until November 9, 2010 to file any habeas petition in this Court. Since the petition was not filed until April 25, 2011, it is untimely under the AEDPA.

Nonetheless, the limitation period may be tolled for equitable reasons. *See Holland v. Florida,* ––– U.S. ––––, 130 S.Ct. 2549, 2560–62, 177 L.Ed.2d 130 (2010); *Harper v. Ercole,* 648 F.3d 132, 136 (2d Cir.2011); *Dillon v. Conway,* 642 F.3d 358, 362 (2d Cir.2011). To be entitled to equitable tolling, a petitioner must demonstrate '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland,* ––– U.S. ––––, 130 S.Ct. at 2562, 177 L.Ed.2d 130 (quoting *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)); *see also Harper,* 648 F.3d at 137 ("To be eligible for equitable tolling, a petitioner must demonstrate 'extraordinary circumstances beyond his

control' that prevented him from timely filing his petition." (quoting *Baldayaque v. United States,* 338 F.3d 145, 151 (2d Cir.2003)). "The term 'extraordinary' refers not to the uniqueness of [the petitioner's] circumstances, but rather to the severity of the obstacle impeding compliance with [AEDPA's] limitations period." *Harper,* 648 F.3d at 137; *see also Dillon,* 642 F.3d at 363.

Equitable tolling is available only in "rare and exceptional circumstances," *Harper,* 648 F.3d at 136, where the petitioner "demonstrate[s] a causal relationship between the extraordinary circumstances ... and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Jenkins v. Greene,* 630 F.3d 298, 303 (2d Cir.2010). *cert. denied,* ––– U.S. ––––, 132 S.Ct. 190, 181 L.Ed.2d 98 (2011) (quoting *Valverde v. Stinson,* 224 F.3d 129, 134 (2d Cir.2000)); *see also Harper,* 648 F.3d at 137 (holding that in order to secure equitable tolling, the petitioner must demonstrate that extraordinary circumstances caused him to miss the original filing deadline). "[A] petitioner seeking equitable tolling of AEDPA's limitations period must demonstrate that he acted with reasonable diligence throughout the period he seeks to toll." *Harper,* 648 F.3d at 138 (quotations and citation omitted); *see also Holland,* ––– U.S. ––––, 130 S.Ct. at 2565, 177 L.Ed.2d 130 ("The diligence required for equitable tolling purposes is reasonable diligence, * * * not maximum feasible diligence." (internal quotations and citations omitted)). The determination of whether equitable tolling is appropriate must be made on a case-by-case basis. *Holland,* ––– U.S. ––––, 130 S.Ct. at 2563, 177 L.Ed.2d 130; *see also Jenkins,* 630 F.3d at 305 (recognizing that "equitable procedure demands flexibility in the approach of equitable intervention.")

**\*3** None of the circumstances warranting equitable tolling are present here. Petitioner has not established, *inter alia,* that any extraordinary circumstance beyond his control prevented him from timely filing his habeas petition in this Court. Although some courts have found that a prolonged delay between the issuance of an order necessary to satisfy AEDPA's exhaustion requirement and an inmate's notification of it may provide a basis for equitable tolling if the petitioner had diligently attempted

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 373341 (E.D.N.Y.)

(Cite as: 2012 WL 373341 (E.D.N.Y.))

to ascertain the status of that order and the delay prevented him from timely filing a habeas petition, *see Diaz v. Kelly,* 515 F.3d 149, 155 (2d Cir.2008) (citing cases), there is no indication in this case, *inter alia,* that petitioner acted with reasonable diligence in seeking to ascertain the status of his application for leave to appeal to the New York State Court of Appeals during the more than nineteen (19)-month period between when the application was filed, i.e., between March 10, 2009 and August 11, 2009, and when the petitioner purportedly first learned of it in March 2011. *See, e.g. Cruz v. McGinnis,* No. 11–cv–3442, 2011 WL 5848579, at * 6 (E.D.N.Y. Nov.22, 2011) (finding that generally, periods of delay lasting for more than one (1) year do not exhibit due diligence). Petitioner has provided no details regarding any attempts he made to obtain the status of his leave application from either his retained attorney or from the state court itself, other than to indicate that he wrote to his attorney "a couple of times in late 2009 and early 2010 and received no response from his office," (Letter from petitioner to the Court dated March 18, 2011 ["Pet. Ltr."] ), nor has he indicated that anything prevented him from attempting to ascertain the status of his leave application from the state court, or otherwise, from early 2010, after having failed to receive a response from his attorney, until the limitations period had expired on November 10, 2010. It was petitioner's lack of diligence in failing to attempt to ascertain the status of his leave application for more than fifteen (15) months, i.e., from before August 2009 until the November 9, 2010 AEDPA deadline, not any extraordinary circumstance, that prevented him from timely filing his habeas petition. Moreover, petitioner did not act with reasonable diligence in waiting over one (1) month after learning that his leave application had been denied by the New York State Court of Appeals before filing his habeas petition. *Cf. Diaz,* 515 F.3d at 155 (finding that the petitioner had acted with reasonable diligence in filing his habeas petition one (1) day after learning that his leave application had been denied). Accordingly, respondent's motion to dismiss the petition is granted and the petition is dismissed in its entirety with prejudice as time-barred.

III. CONCLUSION

Respondent's motion to dismiss the petition is granted and the petition for a writ of habeas corpus is dismissed in its entirety with prejudice as time-barred. The Clerk of the Court is directed to enter judgment in favor of respondent, to close this case and to service notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the order to the *pro se* petitioner at his last known address, *see* Fed.R.Civ.P. 5(b)(2)(C).

**\*4** Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(a)(2), a certificate of appealability is denied, as petitioner has not made a substantial showing of a denial of a constitutional right. *Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253.

SO ORDERED.

E.D.N.Y.,2012.

Lago v. Niles
Slip Copy, 2012 WL 373341 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Robert WARREN, Petitioner,
v.
Dale ARTUS, Superintendent of Clinton Correctional
Facility, Respondent.
No. 9:05-CV-1032 (LEK/DEP).

March 30, 2007.
Robert Warren, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Malancha Chanda, Esq., Assistant Attorney General, of counsel, New York, NY, for Respondent.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

### I. Background

**\*1** Petitioner Robert Warren ("Petitioner") filed his *pro se* Petition for habeas corpus in this matter, on August 15, 2005. *See* Petition (Dkt. No. 1). Respondent filed a Motion to dismiss the Petition on July 31, 2006. *See* Motion (Dkt. No. 10). Petitioner filed his Petition while an inmate at Clinton Correctional Facility, in Dannemora, New York. The Clinton Correctional Facility address is the address currently listed for Petitioner on the Docket of this case, and is the last address of record for Petitioner.

On February 20, 2007, a Court Notice was filed informing the parties of the availability of the option to consent to the jurisdiction of the assigned United States Magistrate Judge for all further proceedings. *See* Court Notice (Dkt. No. 12). The copy of the Notice that was mailed to Petitioner, however, was returned as undeliverable, with a notation on the envelope that Petitioner was not at the prison, as he had been paroled. *See* Dkt. No. 13.

In addition, searching the Inmate Locator maintained by the New York State Department of Correctional Services-using Petitioner's Department ID Number 98-A-5547-the Court has determined that Petitioner was discharged on October 23, 2006. *See* N.Y.S. DOCS Inmate Population Information Search website *at* http://nysdocslookup.docs.state.ny.us/kinqw00 (last visited Mar. 27, 2007).

In the March 2006 Order of this Court, Petitioner was clearly warned that: **"Petitioner is also required to promptly notify the Clerk's Office and counsel for Respondent of any change in his address; his failure to do so will result in the dismissal of this action".** *See* March 2006 Order (Dkt. No. 6) at 3 (emphasis in original).

Furthermore, a Report and Recommendation was filed on March 12, 2007, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.4 of the Northern District of New York. *See* Report-Rec. (Dkt. No. 22). Said Report-Recommendation recommends granting Respondent's Motion to dismiss, and dismissing Petitioner's Petition. *Id.* Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED.R.CIV.P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Respondent has, however, filed a Letter Request asking this Court to adopt Judge Peebles' Report-Recommendation in its entirety. *See* Resp's Letter Request (Dkt. No. 16). In addition, after examining the record, the Court has determined that the Report and Recommendation is not subject to attack for plain error or manifest injustice.

Therefore, after review of the Report-Recommendation, and for the reasons that follow, this Court **adopts** Judge Peebles' Report-Recommendation **in its entirety,** Respondent's Motion is **granted,** Petitioner's habeas Petition is **dismissed,** and this case is **closed.**

### II. Discussion

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

*2 United States Courts are vested with broad discretion to impose sanctions for non-compliance with court orders, and those sanctions can include the severe sanction of dismissing a case. See *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,* No. 01 Civ. 6600(RLC), 2005 WL 3370542, at *1 (S.D.N.Y. Dec. 12, 2005) ("Moreover, the court has the inherent authority to dismiss a case when a party disobeys any of its orders.") (citing *Chambers v. Nasco, Inc.,* 501 U.S. 32, 45 (1991)). *Southridge* addressed discovery orders, but there is also no difference for non-compliance with any other court order. See *Dumpson v. Goord,* No. 00-CV-6039 CJS, 2004 WL 1638183 (W.D.N.Y. Jul. 22, 2004) (Court ordered one of the plaintiffs to provide address where he could be reached; plaintiff failed to comply; plaintiff was dismissed from the case). Rule 41(b) of the *Federal Rules of Civil Procedure* addresses not only a plaintiff's failure to prosecute, but also a plaintiff's "failure ... to comply with these rules or any order of court". FED.R.CIV.P. 41(b). *See also Dumpson,* 2004 WL 1638183, at *2 ("a court may *sua sponte* dismiss a plaintiff's action for failure to comply with an order of the court.... Such decisions are committed to the Court's sound discretion.... *Pro se* plaintiffs are entitled to a degree of leniency, but this 'should not extend to the disregard of a judge's plain directives.' ") (citing, *inter alia, Costello v. United States,* 365 U.S. 265, 286-87 (1961); *Lucas v. Miles,* 84 F.3d 532, 538 (2d Cir.1996)).

Both attorneys and *pro se* litigants are required to immediately notify the Court and their adversaries of any change in their address or contact information. *See* N.D.N.Y. L.R. 10.1(b)(2). "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action." N.D.N.Y. L.R. 41.2(b). "The demand that plaintiffs provide contact information is no esoteric rule of civil procedure, but rather the obvious minimal requirement for pursuing a lawsuit." *Dumpson,* 2004 WL 1638183, at *3.

Moreover, as then-District Judge Pooler stated:

It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between

the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany County Corr. Facility Staff,* No. 95-CV-1525, 1996 WL 172699, at *1 (N.D.N.Y. Apr. 10, 1996) (Pooler, D.J.) (quoting *Perkins v. King,* No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see, generally,* N.D.N.Y. L.R. 41.2(b).

*3 The Second Circuit in *LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206 (2d Cir.2001), held that:

*pro se* plaintiffs should be granted special leniency regarding procedural matters.... Finally, "this court has repeatedly detailed factors ... to be considered before dismissal for failure to comply with a court order," and these factors significantly cabin a district court's discretion under Rule 41(b), so that "deference is due to the district court's decision to dismiss a *pro se* litigant's complaint only when the circumstances are sufficiently extreme."... Specifically, a district court contemplating dismissing a plaintiff's case, under Rule 41(b), for failure to prosecute must consider: "[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has take[n] care to strik[e] the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard ... and [5] whether the judge has adequately assessed the efficacy of lesser sanctions."

*LeSane,* 239 F.3d at 209 (citing and quoting *Lucas,* 84 F.3d at 535; *Alvarez v. Simmons Mkt. Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988)).

This Court has evaluated the factors as set forth by the Second Circuit. Petitioner's inaction and failure to update his address has spanned several months. Petitioner has clearly failed to comply with an Order of the Court (March 2006-*see* Dkt. No. 6) and with Local Rule 10.1(b)(2) in failing to update his address. Petitioner's own failure to update his address has frustrated this Court's ability to contact him. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

Court finds that it would be futile to make any further attempts to contact Petitioner. *See, generally, Bottom v. Cooper,* No. 03-CV-6493L, 2005 WL 2496052 (W.D .N.Y. Oct. 7, 2005).

Given the law and factors discussed above, Petitioner's failures in this matter warrant the imposition of the sanction of dismissal.

### III. Conclusion

Based on the foregoing discussion, it is hereby **ORDERED,** that the Report-Recommendation (Dkt. No. 14) is **APPROVED and ADOPTED in its ENTIRETY;** and it is further

**ORDERED,** that Respondent's Motion to dismiss (Dkt. No. 10) is **GRANTED;** and it is further

**ORDERED,** that Petitioner's Petition for a writ of habeas corpus (Dkt. No. 1) is **DISMISSED** both for the reasons contained in Judge Peebles' Report-Recommendation and due to Petitioner's failure to update his address as required by this District's Local Rules and a prior Order of the Court. The Clerk of the Court shall **CLOSE Case Number 9:05-CV-1032 (LEK/DEP);** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

**\*4** Petitioner Robert Warren, who at the time of filing was a prison inmate as a result of a 1998 St. Lawrence County conviction of six separate offenses based upon a guilty plea entered in satisfaction of nine pending indictments, has commenced this proceeding seeking federal habeas relief, pursuant to 28 U.S.C. § 2254. In his petition, Warren asserts that the cumulative sentence imposed in connection with his crimes of conviction, and upheld on appeal, resulted in his serving two sentences for the same offense.

In response to Warren's petition respondent has moved seeking its dismissal, arguing that its filing was untimely under the governing limitation provision, and that there is no basis to find equitable tolling or otherwise excuse its lateness. Respondent's motion also addresses the merits of Warren's petition, asserting that the state courts' rejection of his double jeopardy claim was neither contrary to nor an unreasonable application of governing clearly established Supreme Court precedent.[FN1]

> FN1. While moving for pre-answer dismissal of a section 2254 petition is generally not a favored practice, there is authority to support a respondent's choice to make such a motion under appropriate circumstances. *See McLeod v. Moscicki,* No. 02 Civ. 9335, 2003 WL 22427757, at *3 (S.D.N.Y. Oct. 22, 2003) (allowing a Rule 12(b)(6) motion under similar circumstances, and citing cases); *see also, e.g., Valverde v. Stinson,* 224 F.3d 129, 136 (2d Cir.2000) (discussing motion to dismiss on basis of section 2244 without comment on procedural propriety); *Garcia v. Portuondo,* 334 F.Supp.2d 446, 450 (S.D.N.Y.2004) (same).

Having carefully reviewed the parties' submissions and considered their arguments regarding the preliminary, threshold issue, I find that the filing of the petition in this matter was untimely, and that the petitioner has presented no basis to overlook this deficiency. Turning to the merits of Warren's otherwise untimely petition, and assuming that his habeas claim is deemed to have been properly exhausted, when considered with the requisite deferential standard as a backdrop, I find that the state court's rejection of that claim is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

*I. BACKGROUND*

On August 4, 1998, at the time faced with as many as nine pending indictments against him, petitioner entered a plea of guilty in St. Lawrence County Court to six separate felony offenses, including attempted escape in the first degree, attempted second degree burglary, criminal possession of marijuana in the second degree, first degree criminal contempt, sexual abuse in the first degree, and driving while intoxicated. *See* Transcript of Plea Hearing,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

conducted on August 4, 1998, at 2-19. As a result of those pleas, petitioner was sentenced on September 8, 1998 as a second felony offender to various determinate and indeterminate prison terms, some of which were to run concurrently, while others were to be consecutively served, resulting in an aggregate sentence of between nine and ten and one-half years of incarceration. FN2 Transcript of Sentencing Hearing, conducted on September 8, 1998, at 2-22; *see also* People v. Warren, 280 A.D.2d 75, 76, 721 N.Y.S.2d 152, 152-53 (3d Dep't 2001). Also included as part of the trial court's sentence was the issuance of an order of protection in favor of petitioner's spouse and stepdaughter, both of whom were found to be victims of certain of his crimes. *Warren,* 280 A.D.2d at 76, 721 N.Y.S.2d at 153. Petitioner was represented by counsel both at the time of entry of his plea, and at sentencing.

> FN2. The sentence imposed by the trial court included 1) an indeterminate term of imprisonment of between one and one-half and three years for attempted escape in the first degree; 2) a determinate term of three and one-half years on the charge of attempted second degree burglary, to run consecutively to the sentence for attempted escape; 3) an indeterminate term of between two and four years of incarceration on the drug possession charge, to run concurrently with the sentences for attempted escape and attempted burglary; 4) an indeterminate term of two to four years of imprisonment on the charge of first degree criminal contempt, to run concurrently with the sentences for both attempted escape and attempted burglary; 5) a determinate term of four years of imprisonment on the charge of first degree sexual abuse, to run consecutively to the sentences for attempted escape and attempted burglary, but concurrently with the sentences for marijuana possession and criminal contempt; and 6) an indeterminate term of imprisonment of between two and four years on the charge of driving while intoxicated, to run concurrently with all other sentences. *See* Transcript of Sentencing Hearing, conducted on September 8, 1998, at 16-20. The net result of those sentences required petitioner to serve consecutive sentences of one and one-half to three years for attempted escape, three and one-half years for attempted burglary, and four years for sexual

abuse, yielding an aggregate sentence of between nine and ten and one-half years of incarceration.

**\*5** Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Third Judicial Department, resulting in the issuance by that court of a decision dated March 1, 2001, modifying the conviction in a manner which did not affect his sentence of incarceration, and otherwise affirming the trial court's judgment. *Id.* at 77-78, 721 N.Y.S.2d at 153-54. While rejecting the argument now being made to this court, regarding the cumulative effects of his sentence, in its opinion the Third Department did conclude that the trial court had erred in its issuance of the order of protection, in that it exceeded in duration the maximum period authorized under New York law. *Id.* at 77, 721 N.Y.S.2d at 153. Finding the information necessary to affix an appropriate expiration date to be lacking in the record, the Appellate Division remitted the matter to the trial court for the limited purpose of reissuing an appropriate order of protection with a proper end date. *Id.* at 78, 721 N.Y.S.2d at 153-54. In its decretal paragraph, the Third Department

> [o]rdered that the judgment is modified, on the law, by reversing so much thereof as fixed the duration of the order of protection; matter remitted to the County Court of St. Lawrence County for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.

*Id.* There is no indication in the record that petitioner sought leave to appeal that determination to the New York State Court of Appeals.FN3 It was not until on or about July 12, 2004 that the trial court acted upon the remittitur and issued a new order of protection in the case. *See* Petitioner's Memorandum (Dkt. No. 11) Attachment 6.

> FN3. In his petition, Warren asserts that permission for leave to appeal that determination was made, but denied. *See* Petition (Dkt. No. 1) ¶ 9(e), at 3. There is no support for this assertion, however, either in the state court records provided by respondent's counsel or in the reported history associated with that appeal. Moreover, in a later submission, Warren acknowledged that he did not pursue the matter to the New York State Court of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

Appeals. *See* Amended Memorandum (Dkt. No. 5) ¶ 3, at 2.

In addition to perfecting a direct appeal from his judgment of conviction, petitioner has pursued efforts to obtain two separate forms of collateral relief from the state courts. On August 31, 2004, Warren filed an application under section 440.20 of the N.Y. Criminal Procedure Law to set aside his sentence. That application was denied by order issued by County Court Judge Kathleen Rogers on October 19, 2004. Leave to appeal that determination to the New York State Court of Appeals was subsequently denied by the Third Department on December 29, 2004.

Petitioner also sought relief in the state courts through the filing on May 6, 2004, in Clinton County Supreme Court, of an application for a writ of habeas corpus pursuant to Article 70 of the N.Y. Civil Practice Law and Rules. By decision and judgment issued on June 7, 2004, Acting Supreme Court Justice S. Peter Feldstein denied petitioner's application for state court habeas relief. That determination was upheld, on appeal to the Third Department, by decision issued on April 21, 2005. *See People ex rel. Warren v. Artus, 17 A.D.3d 896, 792 N.Y.S.2d 879 (3d Dep't 2005).*[FN4] On June 30, 2005, leave to appeal the denial of habeas relief to the New York Court of Appeals was denied. *People ex rel. Warren v. Artus, 5 N.Y.3d 705, 834 N.E.2d 1262 (2005).*

> FN4. An application for reargument of the state court's refusal to grant habeas relief was denied on August 26, 2004.

II. *PROCEDURAL HISTORY*

*6 Petitioner commenced this proceeding on August 15, 2005. Dkt. No. 1. Appropriately named as the respondent in Warren's petition is Dale Artus, Superintendent of the Clinton Correctional Facility, where petitioner was held at the time of filing. *Id.* Following the filing by petitioner on December 22, 2005 of a legal memorandum in support of his habeas petition, Dkt. No. 5, apparently prompted by a previously-issued order by District Judge Lawrence E. Kahn on November 21, 2005, Dkt. No. 4, respondent Artus, who is represented by the office of the New York State Attorney General, responded by the filing on July 31, 2006 of a motion to dismiss Warren's petition on the basis of the

governing one year statute of limitations, and additionally on the merits. Dkt. No. 10. Petitioner has since countered in opposition to that motion. Dkt. No. 11.

Respondent's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. Rule 72(b).

III. *DISCUSSION*

A. *Mootness*

Of its own initiative, the court has made an investigation as to petitioner's current status, and has learned that he was released from custody in Clinton County of the October of 2006. *See* http://nysdocslookup.docs.state.ny.us. The court must therefore determine whether Warren's release from prison, subsequent to commencement of this proceeding, renders the habeas claims now raised moot.

Habeas corpus relief is available to a state prisoner who is "in custody pursuant to the judgment of a State court ... on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States". 28 U.S.C. § 2254(a). While on its face this provision contemplates that a habeas petitioner be in custody, section 2254 does not require that a petitioner be physically confined in order for a federal district court to retain jurisdiction over a properly filed habeas petition. *See Maleng v. Cook, 490 U.S. 488, 491, 109 S.Ct. 1923, 1925 (1989).* Thus, for example, a petitioner who, like Warren, has been released from custody after the filing of a habeas petition satisfies the "in custody" requirement of section 2254 if he or she remains subject to adverse collateral consequences which result from the subject conviction. *See Carafas v. LaVallee, 391 U.S. 234, 237-39, 88 S.Ct. 1556, 1559-60 (1968).* Collateral consequences are presumed to persist as a result of a conviction even after an inmate's release from prison.[FN5] *Spencer v. Kemna, 523 U.S. 1, 12, 118 S.Ct. 978, 985 (1998)* ("it is an 'obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences' ") (quoting *Sibron v. New York, 392 U.S. 40, 55, 88 S.Ct. 1889, 1899 (1968)*); *see also, e.g., Barker v. Reynolds, No. 9:98-CV-0732, 2001 WL 1860929, at *2 (N.D.N.Y. Apr. 19, 2001)* (Sharpe, M.J.) (citing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

*Spencer* and *Sibron); Binder v. Szostak,* No. 96-CV-840, 1997 WL 176353, at *3 (N.D.N.Y. Apr. 11, 1997) (Pooler, J. and DiBianco, M.J.).

> FN5. Examples of such potential collateral consequences can include the inability to serve as a juror, engage in certain businesses, or vote. *Johnson v. Levine,* No. 00 Civ. 8402, 2001 WL 282719, at *1 (S.D.N.Y. Mar. 21, 2001).

**7** In this case, since there is no indication the petitioner no longer suffers from any adverse consequences from his conviction, his claims do not appear to have been rendered moot by his release from prison.

B. *Statute of Limitations*

Enactment by Congress of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), brought about significant changes to the prisoner litigation landscape. One of those was the institution of a one-year statute of limitations for habeas corpus petitions filed after April 24, 1996. 28 U.S.C. § 2244(d).[FN6]

> FN6. That section provides, in relevant part, that

> (1) [a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> * * *

> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

> 28 U.S.C. § 2244(d).

The obvious starting point for resolving issues surrounding the timeliness of a section 2254 habeas petition is a determination of when the challenged conviction became final. In most cases, including in connection with convictions finalized subsequent to the April 24, 1996 effective date of the AEDPA, a state conviction becomes final when the time to seek review in the Supreme Court by petition for writ of *certiorari* expires. *Williams v. Artuz,* 237 F.3d 147, 151 (2d Cir.), *cert. denied,* 534 U.S. 924, 122 S.Ct. 279 (2001). In this case, however, petitioner did not seek leave to appeal the Third Department's determination to the New York State Court of Appeals. Accordingly, Warren's conviction became final on March 31, 2001, upon expiration of the thirty day period within which to seek review by that court of the Appellate Division's decision affirming his conviction. *Bethea v. Girdich,* 293 F.3d 577, 578 (2d Cir.2002); *People v. Wooley,* 40 N.Y.2d 699, 700-01, 358 N.E.2d 493, 494 (1976); *see* N.Y. Criminal Procedure Law § 460.10(5)(a).

In his opposition to respondent's motion, petitioner argues that because of the fact that the Appellate Division remitted the matter to the sentencing court for the issuance of an amended order of protection, an act which did not occur until July of 2004, the Third Department's decision was not immediately appealable, and thus his conviction was not final, until after the amended order of protection was issued. In making that argument, Warren places heavy reliance upon the Ninth Circuit's decision in *United States v. Colvin,* 204 F.3d 1221 (9th Cir.2000). In that case the two judge majority of the panel hearing the case, over a spirited dissent, concluded that an appellate decision which affirmed the defendant's conviction on two of three counts, but reversed as to the third and remanded the matter to the trial court with directions to strike the conviction on the third count and make a corresponding reduction in the special assessment imposed, was not a final determination which sufficed to trigger commencement of the applicable period for seeking habeas review, in that case under 28 U.S.C. § 2255.[FN7] *Id.* at 1222-26.

> FN7. 28 U.S.C. § 2255 prescribes a mechanism for a sentenced federal prisoner to challenge his or her continued custodial status by seeking to vacate, set aside or correct the sentence, thereby partially supplanting earlier jurisprudence relying upon 28 U.S.C. § 2241 to accomplish such an end. *Cephas*

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

*v. Nash,* 328 F.3d 98, 103-04 (2d Cir.2003).

Unfortunately for Warren, the Ninth Circuit's decision in *Colvin* has not been universally accepted, and in fact was recently rejected by the Second Circuit in *Burrell v. United States,* 467 F.3d 160 (2d Cir.2006). In *Burrell,* after reviewing the applicable caselaw, which was noted to be in conflict, including the Ninth Circuit's decision in *Colvin,* the Second Circuit concluded that when a portion of a criminal judgment is reversed and the matter is remanded to the trial court solely for the purpose of performing a "strictly ministerial task of correcting the judgment" in a manner not affecting the defendant's sentence, the appellate decision is not thereby deprived of finality. *Id.* at 169.

**\*8** In order to determine whether *Burrell* is controlling in this case, it is necessary to understand the interplay between the petitioner's judgment of conviction and the order of protection issued by the trial court. New York law defines the term "judgment" as being "comprised of a conviction and the sentence imposed" by the court. N.Y.Crim. Proc. Law § 1.20(15) (McKinney 2003); *People v. Hernandez,* 93 N.Y.2d 261, 267, 689, 711 N.E.2d 972, 975 (1999). A criminal defendant has the right to appeal a "judgment." N.Y.Crim. Proc. § 450.10 (McKinney 2005); *People v.. Nieves,* 2 N.Y.3d 310, 314, 778 N.Y.S.2d 751, 811 N.E.2d 13, 16 (2004); *Hernandez,* 93 N.Y.2d at 269, 711 N.E.2d at 976. Under New York Law, an order of protection is not a form of punishment or a component of sentencing, but is instead a measure taken to protect victims and witnesses. *Nieves,* 2 N.Y.3d at 316, 811 N.E.2d at 7. An order of protection issued at the time of sentencing is, nonetheless, "part of the final adjudication of the criminal action involving [the] defendant." *Id.* at 315, 811 N.E.2d at 16.

In *Nieves,* the court drew an analogy between an order of protection and a certification as a sex offender under the Sex Offender Registration Act, codified at N.Y. Correction Law § 168 *et seq. Id.* at 315, 811 N.E.2d at 16-17. The court held that while neither is a component of sentencing, both are part of the final judgment of conviction in a criminal case. *Id.* Accordingly, a defendant has the right to appeal an order of protection entered at sentencing. *Id.* Applying a similar line of reasoning, in *Hernandez* the court held that the defendant's certification as a sex offender "was

unmistakably part of the court's final adjudication with respect to defendant's crimes," and that the certification, along with the order of protection entered against the defendant, "formed an integral part of the conviction and sentencing." 93 N.Y.2d at 267, 711 N.E.2d at 975. It is thus apparent that under New York law, the issuance of an order of protection entered at sentencing, while not affecting a defendant's sentence, is part of the final judgment entered in a criminal case.

The circumstances now presented are closely analogous to those before the court in *Burrell.* As in *Burrell,* the Third Department remitted the matter to the trial court for the sole purpose of performing a ministerial task, in this case to recalculate the duration of its order of protection. In doing so the Third Department issued specific directives for the court to follow when affixing the duration of the order of protection, instructing it that "the maximum duration of the order of protection is three years from the date of the expiration of the four-year maximum" of the sentences imposed upon the criminal contempt and sexual abuse convictions. *Warren,* 280 A.D.2d at 77-78, 721 N.Y.S.2d at 153. While the trial court unmistakably retained the discretion to issue an order of protection of a shorter duration, it had already plainly evidenced its intention to issue one to remain in effect for the maximum allowable period. On remand, the trial court was thus left to perform a mere arithmetic calculation, using as guidance the specific instructions provided by the Third Department. That calculation thus was one which " 'involv[ed] obedience to instructions ... instead of discretion, judgment, or skill,' " and was therefore a ministerial duty. *Burrell,* 467 F.3d at 164 (*quoting* Blacks Law Dictionary 1017 (8th Ed.2004)). Because the remand was clearly for "ministerial purposes," it did not delay the "judgment's finality." *Id.* Based upon these circumstances I find that petitioner's judgment of conviction became final thirty days following issuance of the Third Department's decision, or on March 31, 2001.

**\*9** Once the appropriate limitation period commencement date is established, it is next necessary to determine whether there are any intervening tolling periods resulting from applications by the petitioner for collateral review. Under the AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

claim is pending" is properly excludable from the one year limitation period, and results in its tolling. 28 U.S.C. § 2244(d)(2). Because the applicable statute speaks in terms of tolling, however, any such collateral or other review application filed within the otherwise applicable one year statute of limitations merely serves to toll the limitation period; such an event does not have the effect of resetting the one year clock. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.) *(per curiam), cert. denied,* 531 U.S. 840, 121 S.Ct. 104 (2000); *see also Stokes v. Miller,* 216 F.Supp.2d 169, 172 N.3 (S.D.N.Y.2000) ("It is well-settled that post-conviction or other collateral review does not start the one year statute of limitations to run anew") (citing *Smith).*

The petitioner in this case filed two applications for collateral review, one by way of an application under section 440.20 to vacate his sentence, and the other in the form of a petition seeking state court habeas review under Article 70 of the N.Y. Civil Practice Law and Rules. Since both of those applications were filed in 2004, and thus after expiration of the one year limitation period, they did not effect any tolling of that period.[FN8] Consequently, even giving petitioner the benefit of the prison mailbox rule, in light of his *pro se* inmate state status, *see Noble v. Kelley,* 246 F.3d 93, 97 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197 (2001), and assuming that the petition was conveyed to prison officials on August 12, 2005, the day on which it was signed, it was untimely absent a basis to overlook its lateness.

> FN8. Although a timely application under section 440.20 filed within one year after petitioner's judgment of conviction became final would have served to toll the application limitations period, *see King v. Cunningham,* 442 F.Supp.2d 171, 180 (S.D.N.Y.2006), the situation is less clear with regard to his habeas petition. *See Martino v. Berbary,* No. 03-CV-0923, 2005 WL 724133, at *2 (W.D.N.Y. Mar. 30, 2005) (collecting cases and noting a split among courts within the circuit on this issue).

C. *Equitable Tolling*

While Warren's petition is facially time-barred, the Second Circuit has cautioned that a habeas petition which

would otherwise be subject to dismissal in light of the AEDPA's statute of limitations may nonetheless be considered by a district court where the court determines that the statute of limitations should be equitably tolled. *See Smith,* 208 F.3d at 17-18. And, although the Second Circuit has acknowledged that the "question remains open" as to whether the United States Constitution requires that an "actual innocence' " exception be engrafted onto the AEDPA's statute of limitations, *see Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir.2003), that court has nevertheless directed district courts to consider a properly raised claim of actual innocence as a basis for invoking equitable tolling before dismissing a habeas petition as untimely filed. *Id.; see also Doe v. Menefee,* 391 F .3d 147, 161 (2d Cir.2004).

1. *Traditional Tolling*

**\*10** Equitable tolling applies "only in the 'rare and exceptional circumstance[ ].' " *Smith,* 208 F.3d at 17 (quoting *Turner v. Johnson,* 177 F.3d 390, 391-92 (5th Cir.), *cert. denied,* 528 U.S. 1007, 120 S.Ct. 504 (1999)) (alteration in original). Under traditional tolling principles, the equitable tolling of the AEDPA's statute of limitations is only available when " 'extraordinary circumstances' prevent a prisoner from filing a timely habeas petition." *Warren v. Garvin,* 219 F.3d 111, 113 (2d Cir.2000) (quoting *Smith,* 208 F.3d at 17); *see also Agramonte v. Walsh,* No. 00 CV 892, 2002 WL 1364086, at *1 (E.D.N.Y. June 20, 2002). "To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski,* 273 F.3d 133, 138 (2d Cir.2001) (quoting *Smith,* 208 F.3d at 17), *cert. denied,* 535 U.S. 1017, 122 S.Ct. 1606 (2002); *see also Warren,* 219 F.3d at 113 (citing *Smith,* 208 F.3d at 17).

In this instance, petitioner does seemingly request equitable tolling, arguing that his lack of access to sufficient books and legal assistance, as well as the fact that he did not receive (or even request) a copy of his sentencing minutes until April of 2004, provide a basis for equitable tolling. Such circumstances, however, are insufficiently unusual or compelling to warrant a finding of equitable tolling in this case. *Gant v. Goord,* 430 F.Supp.2d 135, 139 (W.D.N.Y.2006) ("In general, the difficulties attendant on prison life, such as transfers between facilities, solitary

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances."); *Peck v. United States,* No. 06-CV-0822, 03-CR-496, 2006 WL 3762001, at *5 (N.D.N.Y. Dec. 20, 2006) (finding no basis for equitable tolling where petitioner claimed that he had inadequate access to legal books and legal assistance).

**2.** *Actual Innocence Tolling*

To ameliorate the harshness of the AEDPA's one year procedural bar to seeking habeas review in the unusual case where the petitioner appears to be the victim of a fundamental miscarriage of justice and is actually innocent of the crime of conviction, courts, including the Second Circuit, have suggested that the presentation of a credible claim of actual innocence may provide a basis for equitable tolling, provided that the petitioner can also show that he or she pursued the claim with reasonable diligence. *Doe,* 391 F.3d at 161; *Whitley,* 317 F.3d at 225. Addressing the tension which such an exception would potentially present with respect to the considerations of comity and finality underpinning the AEDPA's limitations requirement, the Second Circuit observed that "[b]ecause credible claims of actual innocence are 'extremely rare,' federal court adjudication of constitutional challenges by petitioners who may be actually innocent prevents miscarriages of justice, but does not threaten state interests in finality." *Doe,* 391 F.3d at 161 (citing *Schlup v. Delo,* 513 U.S. 298, 321-22, 115 S.Ct. 851, 864-65 (1995)). Drawing upon the Supreme Court's decision in *Schlup,* which addressed the actual innocence exception to a petitioner's ability to file successive or otherwise procedurally barred habeas petitions in federal courts, the Second Circuit in *Doe* required that the claim of actual innocence be supported "with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Doe,* 391 F.3d at 161 (quoting *Schlup,* 513 U.S. at 324, 115 S.Ct. at 865).

**\*11** In this instance Warren does not allege that he is actually innocent of the crimes of his conviction, which was the product of his guilty plea and concomitant admission of having committed those offenses. Accordingly, Warren has not provided any compelling grounds for the court to apply the *Whitley* test and recommend that the AEDPA statute of limitations be tolled based upon a claim of actual innocence.

*See, e.g., Catala v. Bennett,* 273 F.Supp.2d 468, 473-74 (S.D.N.Y.2003) (acknowledging *Whitley's* application to claims of actual innocence but declining to apply it when the petitioner in that case did not attempt an actual innocence claim).

In sum, I recommend against the invocation of equitable tolling to salvage Warren's otherwise untimely petition.

**D.** *Merits of Warren's Petition*

As has been noted, petitioner apparently did not pursue the direct appeal of his conviction to the State's highest court. He did, however, assert arguments surrounding his sentencing, and specifically his claim that the resulting term of incarceration was unlawful, in the context of both his motion to vacate his sentence, pursuant to section 440.20 of the N.Y. Criminal Procedure Law, and by way of his petition for state habeas relief. Since both of those resulting determinations were pursued through to the Appellate Division, and a request was made for leave to appeal to the Court of Appeals from the denial of his state habeas petition, respondent does not contest Warren's petition on the procedural basis of failure to exhaust and, consequently, I will assume that he has fulfilled his obligation to pursue his claims to the highest state court before seeking to elicit this court's habeas intervention, and will turn to the merits of his claim.

**1.** *Standard of Review*

Critical to a review of the merits of Warren's petition is recognition of his deferential standard which this court must apply. Enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), brought about significant new limitations on the power of a federal court to grant habeas relief to a state court prisoner under 28 U.S.C. § 2254. Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir .2001) (quoting § 2254(e)(1)) (internal quotes omitted). Significantly, a federal court may not grant habeas relief to a state prisoner on a claim

that was adjudicated on the merits in State court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

proceedings unless the adjudication of the claim-

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**\*12** 28 U.S.C. § 2254(d); *see also Noble v. Kelly,* 246 F.3d 93, 98 (2d Cir.), *cert. denied,* 122 S.Ct. 197 (2001); Boyette, 246 F.3d at 88. When applying this test, the Second Circuit has noted that

[u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001) (citing *Williams v. Taylor* and *Francis S. v. Stone,* 221 F.3d 100, 108-09 (2d Cir.2000)).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Shriver,* 255 F.3d 45, 52-55 (2d Cir.2001). Specifically, as the Second Circuit explained in *Sellan v. Kuhlman,* "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." 261 F.3d 303, 312 (2001); *see Jimenez v. Walker,* 458 F.3d 130, 140 (2d Cir.2006). Significantly, the Second Circuit further held that when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-*even if the state court does not explicitly refer to*

*either the federal claim or to relevant federal case law." Sellan,* 261 F.3d at 312 (emphasis added).[FN9,FN10]

FN9. In the past, when wrestling with interpretation and application of the AEDPA's deference standard the Second Circuit had suggested, although leaving open the question, that deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim in a manner adequate to justify deference under AEDPA, in which case pre-AEDPA standards would apply. *Washington,* 255 F.3d at 52-55; *see also Noble,* 246 F.3d at 98. That court clarified in *Sellan,* however, that the question of whether or not a state court makes specific reference to a constitutional principle is not controlling.

FN10. In his opinion in *Sellan,* Chief Judge Walker acknowledged that enlightenment in state court decisions as to the manner of disposition of federal claims presented would greatly enhance a federal court's ability, on petition for habeas review, to apply the AEDPA deference standard. *Sellan,* 261 F.3d at 312. He noted, however, that a state court's failure to provide such useful guidance does not obviate a federal court's duty to make the analysis and pay appropriate deference if the federal claim was adjudicated on the merits, albeit tacitly so. *Id.*

When a state court's decision is found to be decided "on the merits", that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20. Moreover, a federal court engaged in habeas review must also determine not whether the state court's determination was merely incorrect or erroneous, but instead whether it was "objectively unreasonable". *Sellan,* 261 F.3d at 315 (quoting *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521 (O'Connor, J.)). The Second Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great [.]" *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

2. *Clearly Established Supreme Court Precedent*

Warren's petition asserts a single ground, alleging that the net affect of the various sentences imposed in connection with the six crimes of connection was to render the sentence unlawful, in derogation of his right to be free from double jeopardy.

**\*13** The double jeopardy clause, which forms an integral part of the Fifth Amendment to the United States Constitution, provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. Amend. V. The essence of controlling double jeopardy jurisprudence has been summarized as follows by the Second Circuit:

> [t]he Double Jeopardy Clause protects, among other things, against multiple punishments for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.E.d.2d 656 (1969). When two acts violate the same statute, ... the Supreme Court has distinguished between a statute that punishes a continuous offense and one that punishes distinct acts. *See Blockburger v. United States,* 284 U.S. 299, 303, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (two drug sales to the same person on different days punishable as separate offenses). The Court looked to see if lawmakers had intended to criminalize each act. " 'The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.... If the latter, there can be but one penalty.' " *Id.* at 302, 52 S.Ct. 180.

> *McCullough v. Bennett,* 413 F.3d 244, 246 (2d Cir.2005).

It should be noted that the charging of multiple offenses based upon the same conduct does not *per se* violate the double jeopardy clause. *United States v. Cavanaugh,* 948 F.2d 405, 413 n. 8 (8th Cir.1991) (citing *Ohio v. Johnson,* 467 U.S. 443, 449, 104 S.Ct. 2536, 2540-41 (1984)). Instead, the question becomes whether, by enacting the particular criminal provision, the respective legislative body intended that facts underlying the potentially overlapping counts constitute separate " 'units' of prosecution". *United States v. Ansaldi,* 372 F.3d at 118, 124 (2d Cir.2004) (citing *Bell v. United States,* 349 U.S. 81, 83-84, 175 S.Ct. 620, 622 (1955)).

Petitioner's double jeopardy argument is perplexing. The operative crimes for which he received consecutive sentences included attempted escape, attempted burglary, and sexual abuse. The court has reviewed the transcribed minutes of petitioner's plea hearing and finds no basis to conclude that in accepting pleas to those three charges, and imposing consecutive sentences in connection with those pleas, punished the petitioner twice for the same criminal conduct. FN11

> FN11. In his memorandum in opposition to respondent's dismissal motion, petitioner intimates that the sentence that he received may have resulted in a breach of a plea agreement which included assurances as to the sentence to be imposed by the court. *See* Petitioner's Memorandum (Dkt. No. 11) at 12-22. If such a claim is being made it is not apparent from the face of Warren's petition. Moreover, it does not appear that such a claim has ever been fairly presented to the state courts prior to being raised in this proceeding, and therefore is not properly exhausted. *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 808-09 (2d Cir.2000) ("To have exhausted claims in state court, petitioner must have "fairly presented" each federal claim to the highest state court.") (citation omitted).

Accordingly, I find no basis to conclude that the state courts' determination that no double jeopardy violation has occurred, arising from his sentencing, was either contrary to or an unreasonable application of clearly established Supreme Court precedent.

IV. *SUMMARY AND RECOMMENDATION*

Based upon the circumstances now presented, it appears that petitioner's conviction became final when his time to seek leave to appeal to the Court of Appeals from the Third Department's decision affirming his conviction expired, notwithstanding the fact that the matter was remitted to the trial court for an essentially ministerial act, in the nature of substituting a new order of protection which was compliant with the applicable legal provisions under which it was issued for the prior, invalid order. Since the petition in this matter was filed more than a year after that date, and having

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)

(Cite as: 2007 WL 1017112 (N.D.N.Y.))

been presented with no proper basis to conclude that the governing limitation period should be equitably tolled, I recommend a finding that the petition is time barred and should be dismissed on this procedural basis, without reaching the merits. In the event that the court finds that the petition was timely filed and should be considered on its merits, I find that the state courts' determination rejecting Warren's sentence claims was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, and find no other basis to conclude that he was the subject of a constitutional deprivation.

**\*14** Based upon the foregoing it is hereby

RECOMMENDED that respondent's motion to dismiss the petition in this matter [Dkt. No. 10] be GRANTED, and the petition be DISMISSED in all respects.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2007.

Warren v. Artus
Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Anthony MEDINA, Petitioner,
v.
Michael MCGINNIS, Respondent.
No. 04 Civ.2515 SHS AJ.

Sept. 20, 2004.
*REPORT AND RECOMMENDATION*

PECK, Chief Magistrate J.
  **\*1** Petitioner Anthony Medina, represented by counsel, seeks a writ of habeas corpus from his May 14, 1999 conviction in Supreme Court, Bronx County, of first degree manslaughter, and sentence of twelve-and-a-half to twenty five years imprisonment. (Dkt. No. 1: Pet. ¶¶ 1–4.) See *People v. Medina,* 284 A.D.2d 122, 122, 725 N.Y.S.2d 199, 199 (1st Dep't 2001), *leave to appeal denied,* 96 N.Y.2d 732 N.Y.S.2d 639 (2001).
  Medina's habeas petition alleges that: (1) he was denied effective assistance of counsel (Pet.¶ 12(A)); (2) he was denied due process because he was not competent at the time of trial (Pet.¶ 12(B)); and (3) he was denied due process because new evidence demonstrates his actual innocence (Pet.¶ 12(C)).

  For the reasons set forth below, Medina's habeas petition should be DENIED.

*FACTS*

*The Prosecution Case at Trial*
  Around 9:15 p.m. on May 3, 1996, Anthony Medina and Jose Cardenas were inside an illegal social club located at 932 Intervale Avenue in the Bronx. (State Opening: Trial Transcript ["Tr."] 17–18.) Medina shot Cardenas with a .22 caliber gun, exited the club and handed the weapon to an unidentified woman. (State Opening: Tr. 18.) When arrested, he asked, " 'who

snitched me out." ' (State Opening: Tr. 19.) Medina was charged with two counts of second degree murder, first degree manslaughter, first degree reckless endangerment, and second degree and third degree criminal possession of a weapon. (State Opening: Tr. 14–16.) [FN1]

> [FN1.] During trial, the Assistant District Attorney moved to dismiss three of the six counts of the indictment, leaving two counts of second degree murder and one count of first degree manslaughter. (Tr. 485.) The trial judge charged the jury on those three counts and also included second degree manslaughter. (Tr. 629–41.)

*May 3, 1996: Eyewitness Cepero's Testimony*

  On May 3, 1996 at approximately 9:00 p.m., Eugenio Cepero was in the vicinity of 932 Intervale Avenue, working on a car in front of the parking lot. (Cepero: Tr. 308.) Located at 932 Intervale Avenue was a Cuban Club where people could play pool or dominoes, drink alcohol, or purchase powder cocaine. [FN2] (Cepero: Tr. 310–11.) Cepero described the incident that occurred on that night, as follows:

> [FN2.] Cepero admitted to entering the club earlier in the evening in order to buy powder cocaine from Cardenas. (Cepero: Tr. 311–14, 361.) Cepero sold the powdered cocaine to another individual and then used the profit to buy crack cocaine at 941 Intervale Avenue. (Cepero: Tr. 315–17, 362.)

[T]here was loud music coming from the Cuban club across the street. So when music between records, when one record finishes, one begins, there was a muffled shot, just one shot, and then the other record became playing and all of a sudden the door flew open and whole mess of people came out of that club. So after everybody came out and they rushed away, two three girls came out and this individual came out, but before he came out, one of the girls told him to hurry up, hurry up. Then he came out. Then they went towards their left and as they rushed away, he passed a shiny object which appeared to be a gun to the girl

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

on his right hand side that was wearing a bubble jacket. They took off down towards Southern Boulevard.

(Cepero: Tr. 308–09.) [FN3]

> FN3. Although Cepero described the clothing worn by the three girls and their approximate ages (Cepero: Tr. 323–24), he was unable to see their faces because they had their backs turned towards him. (Cepero: Tr. 392–93.)

After hearing the one shot, Cepero "looked around" and "took ... cover." (Cepero: Tr. 321–22, 363.) According to Cepero, about fifteen to twenty people initially exited the club. (Cepero: Tr. 322–23, 331, 364.) Approximately fifteen seconds after the shot was fired, Medina exited the club. (Cepero: Tr. 324, 369.) Cepero identified Medina at trial and testified that he knew Medina by his "[s]treet name Hyper." (Cepero: Tr. 309–10, 325.) Cepero had known Medina for about a year prior to this incident, they were friends, and Cepero had no doubt that Medina was the individual he saw exiting the club. (Cepero: Tr. 333–39.)

*2 Cepero claimed he could tell that the shiny object passed from Hyper to the girl in the bubble jacket was an automatic, "about the size of a .25" caliber gun. (Cepero: Tr. 325–27, 370. 400–01.) [FN4] After watching Medina hand off the weapon and leave the scene, Cepero "saw the body" and "went home." (Cepero: Tr. 329.) On cross, however, Cepero said he stayed at the scene and observed the police activity. (Cepero: Tr. 354.) Although Cepero spoke to the police later that night, he did not tell them that he could make an identification because he "was scared, afraid," afraid of "[g]etting hurt." (Cepero: Tr. 332, 350, 354, 375.)

> FN4. Detective Charles Koch identified the bullet recovered from Cardenas' body as a .22 caliber bullet. (Koch: Tr. 416.) A .22 caliber bullet could not be fired from a .25 caliber semiautomatic weapon. (Koch: Tr. 418, 425.) However, a .22 caliber and .25 caliber gun are "very close" in appearance. (Koch: Tr. 427.)

*Testimony From Law Enforcement Personnel*

On May 3, 1996, Sergeant James Caban and Officer Ricky Santos received a call to report to 932 Intervale Avenue in the Bronx. (Caban: Tr. 109–10, 123–24; Santos: Tr. 145–47, 187, 189.) They approached the scene at approximately 9:30 p.m. (Caban: Tr. 110; Santos: Tr. 187, 189.) Once they arrived at the social club, Sgt. Caban and Officer Santos "saw an open door with a man lying dead on the ground." (Caban: Tr. 110–11; Santos: Tr. 149.) [FN5] Sgt. Caban testified that "[i]t was a very very well lit area." (Caban: Tr. 127; Santos: Tr. 152.) When Officer Santos was asked whether he saw anyone taking off as they approached, he stated, "I believe I didn't see one individual at all. If there was anybody there, it wasn't a major number. It could have been maybe one or two people." (Santos: Tr. 148–49, 157, 161, 190.) Similarly, when Officer Jamie Cuevas arrived at the scene after the original officers, from the time he approached the scene until he left a couple of hours later, he did not see any civilians outside. (Cuevas: Tr. 206–08, 225–26, 229.)

> FN5. Dr. Joseph Cohen of the Medical Examiner's Office testified that Cardenas "died as a result of [a] gun wound of the chest which caused perforations of both lungs and his heart causing significant internal bleeding." (Cohen: Tr. 269.) "The bullet passed through the torso and lodged on the left side of the torso. The trajectory was front to back, it was right to left, and very slightly downward." (Cohen: Tr. 260, 270, 280.)

At approximately 10:30 p.m. Detective Shaw of the Crime Scene Unit arrived at 932 Intervale Avenue. (Shaw: Tr. 49, 76.) Det. Shaw did a walk-through of the social club, and saw the body of Jose Cardenas lying on the ground. (Shaw: Tr. 51–53.) Det. Shaw drew a "rough diagram of the location itself," took "photographs of the exterior of the location and the interior of the location," and dusted for fingerprints. (Shaw: Tr. 52.) Edward Young, a technician employed by the Bronx District Attorney, videotaped the location the way it appeared at 10:45 p.m. that night. (Young: Tr. 99–100.) Four fingerprints and some cigarette butts were taken from inside the social club. [FN6] (Shaw: Tr. 72–73, 75, 87–92, 96.) There were no empty shell casings or weapons recovered at the scene. (Shaw: Tr. 58–59, 80, 85; Caban:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Tr. 112, 119; Santos: Tr. 184, 197–98.) [FN7]

> FN6. Medina's fingerprints were never submitted for comparison with those taken. (McKeon: Tr. 475.)

> FN7. Det. Koch testified that when an automatic gun is fired, as opposed to a revolver, "it extracts the casing and ejects it from the firearm." (Koch: Tr. 410.) The normal ejection of the casing would be "to the right and to the rear, approximately three to four feet." (Koch: Tr. 412.) However, the casing can bounce or roll after hitting the ground. (Koch: Tr. 412–13.) It is possible that the shell casing could not be ejected because it had jammed in the gun. (Koch: Tr. 422–23, 426.) Defense counsel on cross-examination got Det. Koch to admit that he could only "guess" as to what happened in this case. (Koch: Tr. 423–24.)

*Cepero Informs the Police What He Saw; Medina's Arrest and Statement*

On January 4, 1997, Detective McKeon of the 41st Precinct was assigned to investigate Cardena's murder. (McKeon: Tr. 440.) At about 1:40 a.m., Detective McKeon and two other officers interviewed Medina in the 41st Precinct detective squad interview room. (McKeon: Tr. 442–44.) After Det. McKeon advised Medina of his *Miranda* rights (McKeon: Tr. 445–46), Det. McKeon interviewed Medina (McKeon: Tr. 447). Det. McKeon wrote down the story as Medina stated it and read the statement back to him. (McKeon: Tr. 447–48.) Once Medina agreed the statement was accurate, Det. McKeon had Medina sign it. (McKeon: Tr. 448.) Medina's statement read:

> **\*3** I used to work at 932 Intervale Avenue, social club, about four or five times. I worked at the door and I checked for the cops. This social club sold cocaine.... On the day the old Cuban guy got killed I was at 163 Street and Kelley Street by the bodega and a coworker from the ... club, Rafael ... came up to me on the corner and told me that two male blacks wearing masks came into the social club armed with a .9 millimeter and a Tech 9 [FN8] and demanded money

and drugs. Rafael said that there was no money, there was no more drugs in there and they male blacks didn't get nothing and they, male blacks, started shooting. After telling me this I walked to 163 Street and Intervale Avenue and met Danny.... I asked Danny what happened.

> FN8. Det. Koch stated that a .22 caliber bullet could not have been fired from a .9 millimeter or Tech 9 weapon. (Koch: Tr. 419.)

Danny said somebody tried to rob the place and there was some shooting. I told Tyson ... that I shot in there, meaning that I killed the guy. I told Tyson this to make myself look big. I didn't kill this guy and I didn't even shoot him there.

(McKeon: Tr. 453–54.) Medina was not placed under arrest after making the statement. (McKeon: Tr. 455.)

On January 21, 1997, Cepero entered 941 Intervale Avenue around 8:30 p.m. in order to buy crack cocaine. (Cepero: Tr. 340–41.) As he walked up the stairway, he overheard Medina say, "why you dissing me, I'll pop you like I popped the Cuban." (Cepero: Tr. 341–42, 346, 384, 385.) Cepero knew that it was Medina because he recognized his voice. (Cepero: Tr. 341.) Cepero left the building, waited for Medina to leave, and then went in to buy drugs. (Cepero: Tr. 342–43, 390.)

Two days after he overheard the conversation in 941 Intervale Avenue, Cepero was arrested. (Cepero: Tr. 376, 383–84.) Having something to gain from the information, Cepero identified Medina as the shooter who was wanted for Cardenas' murder. (Cepero: Tr. 350, 378–80, 383–84.) According to Cepero, Detective McKeon "talked to [Cepero], [and] he said he might be able to get [Cepero] a lighter sentence." (Cepero: Tr. 351.) When questioned further about this exchange on cross-examination, Cepero stated that he told Det. McKeon that he expected a lighter sentence in return for the information and Det. McKeon said "[t]hey [would] see what they [could] do." (Cepero: Tr. 380.) Cepero was allowed to plead to a misdemeanor and received a sentence of 90 days, instead of a felony with a possible sentence of three and a half to seven years. (Cepero: Tr. 377–83.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Medina was arrested on February 12, 1997. (McKeon: Tr. 441, 456, 475–76.) Det. McKeon informed him that "he was being arrested for the murder of Mr. Cardenas from May 3rd of 1996." (McKeon: Tr. 457.) Detective Peter Tarsnane was present when Medina was placed in the cell at the 41st Precinct. (McKeon: Tr. 459–60, 469–70; Tarsnane: Tr. 497–98.) After McKeon left the room where Medina's cell was located, Det. Tarsnane testified that Medina asked, " 'who snitched me out." ' (Tarsnane: Tr. 499.) Det. Tarsnane told Det. McKeon about what Medina said. (Tarsnane: Tr. 500–01.)

*The Defense Case at Trial*

**\*4** The defense called no witnesses (*see* Tr. 503–06), but made it's case by cross-examining the prosecution's witnesses.

Defense counsel's theme was that "[n]obody's going to dispute there was a shooting and nobody's going to dispute that Mr. Cardenas died as a result of that shooting.... What we are questioning is whether the police got the right person." (Defense Opening: Tr. 26.) In closing argument, defense counsel noted that while motive was not an element of the crime, it was important to consider in determining if Medina was the shooter, and he reminded the jury that no motive evidence was presented. (Defense Closing: Tr. 509–10, 543–44.) He also noted that there was no physical evidence tying Medina to the crime; rather, the entire case was based on Cepero's testimony. (Defense Closing: Tr. 527–32, 543–44.)

Defense counsel argued that Cepero's testimony was unreliable. In addition to referring to Cepero more than once during summation as a "crack head" (Defense Closing: Tr. 521–23; *see* Cepero: Tr. 300) and questioning his motive for testifying (*e.g.,* Defense Closing: Tr. 536–37), defense counsel also pointed out inconsistencies between Cepero's prior statements and trial testimony.

First, before the grand jury Cepero stated that "seven or eight people ran out" after the shooting (Cepero: Tr. 367–68), but at trial, Cepero changed this number to fifteen or twenty (Cepero: Tr. 322–23, 331, 364). (*See* Defense Closing: Tr. 514.) Second, Cepero stated that the police spoke to him and to about fifteen or twenty people

the night of the incident (Cepero: Tr. 332, 354–57), yet none of the testifying police officers recalled seeing or interviewing anyone on that night (Caban: Tr. 119–20; Santos: Tr. 149–50, 157, 161, 183, 190, 194–95; Cuevas: Tr. 220–21, 225). Third, Cepero testified at trial that Medina pulled the shiny object from his waistband (Cepero: Tr. 396), but in a statement taken down by Detective McKeon and signed by Cepero, Cepero stated that Medina had the gun in his hand (Cepero: Tr. 397–99). (*See* Defense Closing: Tr. 520–21.) Fourth, defense counsel pointed out to the jury that while Cepero at trial claimed to overhear Medina say "why you dissing me, I'll pop you like I popped the Cuban" (Cepero: Tr. 341–42, 346, 384–85), on January 23, 1997 Cepero had stated to Det. McKeon that he had heard Medina say, "I'll pop you like the Cuban," which does not say Medina was the shooter. (Cepero: Tr. 387; Defense Closing: Tr. 534–36.) Defense counsel also established through Cepero that Medina liked to brag. (Cepero: Tr. 389.) [FN9]

> [FN9.] On redirect, however, Cepero said it did not sound like Medina was bragging. (Cepero: Tr. 401.)

Defense counsel also attempted to show that Cepero was too far away from the social club's entrance to see Medina exit with a gun. [FN10] In order to determine this distance, Medina's counsel questioned Cepero and the police officers. When Cepero was asked how far he was located from the front door of the social club, he replied "[f]ifty, fifty-five feet. I don't know, I never measured it." (Cepero: Tr. 372.) Defense counsel asked, "[s]o if somebody had come in here and testified that it was a hundred and sixty feet, you would say that that person's incorrect; is that right?" (Cepero: Tr. 372–73.) Cepero answered that he would not know. (Cepero: Tr. 373.) Defense counsel walked to back of the courtroom and asked Cepero if that was about how far away he was from Medina on the night of the incident. (Cepero: Tr. 373.) Cepero said that the distance from the car to the front door was further by "[a]bout half a courtroom more." (Cepero: Tr. 373.) In contrast to Cepero's guestimate, on cross-examination by the defense, Officer Santos testified that the distance from the fence near the parking area (Cepero's location) to the front door of 932 Intervale Avenue was about 160 yards, or the length of about two

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

football fields. (Santos: Tr. 200–01, 203.) On redirect by the prosecution, Officer Santos stated that when measuring, he found the distance to be about 150 paces. (Santos: Tr. 202.) During summation, Medina's counsel gave police officer Santos the "benefit of the doubt" that he probably had meant to say 160 feet instead of yards. (Defense Closing: Tr. 518.) [FN11]

> FN10. Cepero stated that a .25 caliber automatic handgun is about three-and-a-half to four inches long. (Cepero: Tr. 371.)

> FN11. Det. McKeon testified that the distance from a light pole, located in about the same area as the fence, to the front of 932 Intervale is 109 feet. (McKeon: Tr. 463.) In order to measure this distance, Det. McKeon "actually paced off the feet." (McKeon: Tr. 463.)

**\*5** Defense counsel also argued that since no shell casing was found at the crime scene, it was more reasonable to believe the shooter used a revolver than the automatic that Cepero said he saw Medina give to a girl. (Defense Closing: Tr. 515–17.)

*Verdict and Sentence*

On April 22, 1999, the jury found Medina not guilty on both counts of second degree murder and found him guilty of first degree manslaughter. (Verdict: Tr. 659–62.)

On May 14, 1999, Medina was sentenced to twelve-and-a-half to twenty-five years imprisonment. (Dkt. No. 1: Pet. ¶ 3; Dkt. No. 5: A.D.A. Markoe Aff. ¶ 5.)

*Direct Appeal*

On appeal to the First Department, represented by different, appointed appellate counsel, Medina argued that: (1) the judge improperly assisted the prosecution during a pre-trial hearing (Medina 1st Dep't Br. at 12–14); (2) the prosecutor failed to prove Medina's guilt beyond a reasonable doubt and the verdict was against the weight of the evidence (*id.* at 15–16); (3) the prosecutor improperly elicited testimony that Medina did not make a statement following his arrest (*id.* at 16–18); and (4) Medina's sentence should be reduced in the interest of justice to the

minimum permissible term (*id.* at 18–20).

On June 5, 2001, the First Department affirmed Medina's conviction, holding:

> The verdict was based on legally sufficient evidence and was not against the weight of the evidence. Issues of credibility were properly presented to the jury and there is no reason to disturb its determinations.

> Defendant's claim that the court improperly assisted the prosecutor during the suppression hearing is not preserved for appellate review and we decline to review it in the interest of justice. Were we to review this claim, we would find that the court's advice to the prosecutor that he should elicit additional testimony was entirely appropriate.

> We perceive no basis for reduction of sentence.

> Defendant's remaining contentions are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would reject them.

*People v. Medina,* 284 A.D.2d 122, 122–23, 725 N.Y.S.2d 199, 199 (1st Dep't 2001) (citations omitted).

The New York Court of Appeals denied leave to appeal on August 15, 2001. *People v. Medina,* 96 N.Y.2d 922, 732 N.Y.S.2d 639 (2001).

*Medina's C.P.L. § 440 Motion*

On October 11, 2002, represented by his present counsel, Medina filed a C.P.L. § 440.10 motion to vacate his conviction on the following grounds: (1) the trial court erred in failing to order a competency hearing (10/11/02 Medina C.P.L. § 440 Br. at 5–9), and (2) trial counsel rendered ineffective assistance by failing to (a) properly investigate the crime scene, (b) request a competency examination, (c) investigate Medina's medical and psychiatric history, (d) interview a potentially exculpatory witness, (e) thoroughly impeach the prosecution's primary witness, and (f) inform Medina of his right to testify (*id.* at 9–16).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

**\*6** On June 16, 2003, Medina's counsel filed a supplemental motion pursuant to C.P.L. § 440.10(1)(g), asserting that a written recantation from Cepero constituted newly discovered evidence which proved Medina's actual innocence. (6/16/03 Medina Supp. C.P.L. § 440 Motion.) FN12

> FN12. The motion was based on an affidavit from a private investigator and a handwritten statement signed by Cepero, stating that Cepero had told police he saw a "shiny object" in Medina's hands but Det. McKeon told him to say it was a gun. (*Id.*, Exs. B–C.)

Justice Joseph Fisch denied Medina's C.P.L. § 440 motions in their entirety on October 22, 2003. (10/22/03 Justice Fisch Order.) As to Medina's mental competence, Justice Fisch held that "[t]he record, in the instant case, is devoid of any information that would have suggested to this Court that the defendant was not fit to proceed. In fact, the record demonstrates the contrary, and reveals many instances of the defendant's obvious participation in the proceedings and awareness of what was taking place." (10/22/03 Justice Fisch Order at 3.) Justice Fisch elaborated:

> In the instant case, the defendant's purported mental state was never brought to the attention, nor obviously apparent to the trial Court, thus failing to raise a doubt regarding the defendant's competence. The defendant did not manifest by words or actions any reason for this Court to believe nor even suspect that he was not competent to stand trial. The defendant's appearance was that of an active, rational participant throughout his entire trial, in full comprehension of the proceedings. He executed a written waiver of his right to be present during sidebar conferences, consulted with his attorney regarding jury selection and actions to be taken with regard to specific jurors. He prepared written questions for his attorney to use during cross examination, consulted with his attorney regarding the introduction of evidence during trial and had his attorney inform the court of his personal needs during trial. All these actions demonstrated to the Court that the defendant understood the nature of the proceedings and was able to assist in his defense.

The Court had no reasonable grounds to believe the defendant was not competent to stand trial. The defendant's motion pursuant to CPL § 440.10(1)(e) must, therefore, be denied in its entirety.

(*Id.*)

Justice Fisch also denied Medina's ineffective assistance claim. (*Id.* at 4–8.) Based on defense counsel's affidavit, Justice Fisch found that while defense counsel was aware that Medina "suffered from a variety of psychiatric maladies, these ailments never led [defense counsel] to believe the defendant was unable to understand the nature of the proceedings against him nor to assist in his own defense." (*Id.* at 4–5.) Justice Fisch found defense counsel's vigorous cross-examination of Cepero to have been effective. (*Id.* at 6.) Justice Fisch concluded that he was "hard pressed to find the trial strategy of [defense counsel] deficient when the defendant was acquitted of the top charge of Murder," and in general, found counsel's zealous advocacy and vigorous cross-examination to have provided meaningful representation. (*Id.* at 7–8.) Finally, as to Medina's new evidence claim, Justice Fisch found that "Cepero's affidavit is not of such character that it will probably change the result or verdict, if a new trial were granted." (*Id.* at 8.) The Cepero affidavit was "of an unreliable nature" (*id.* at 8–9); "[t]here is no form of proof so unreliable as recanting testimony" (*id.* at 9).

**\*7** On November 17, 2003, Medina moved pro se to reargue and renew his § 440 motion. Justice Fisch denied the motion to reargue on February 9, 2004. (2/9/04 Justice Fisch Order.)

The First Department denied leave to appeal denial of Medina's § 440 motion on February 20, 2004. (2/20/04 1st Dep't Order.) The First Department denied leave to appeal Medina's motion to reargue on May 11, 2004. (Dkt. No. 5: A.D.A. Markoe Aff. Ex. 3: 5/11/04 1st Dep't Order.)

*Medina's Current Federal Habeas Corpus Petition*

Represented by Gary Farrell, the same counsel who represented him in his C.P.L. § 440 motions, Medina's federal habeas corpus petition alleges that: (1) he was denied effective assistance of counsel (Pet.¶ 12(A)); (2) he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

was denied due process because he was not competent at the time of trial (Pet.¶ 12(B)); and (3) he was denied due process because new evidence demonstrates his innocence (Pet.¶ 12(C)).

*ANALYSIS*

I. *THE AEDPA REVIEW STANDARD* [FN13]

> FN13. For additional decisions by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, *see Smalls v. McGinnis,* 04 Civ. 0301, 2004 WL 1774578 at *11–13 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.); *Gillespie v. Miller,* 04 Civ. 0295, 2004 WL 1689735 at *6–8 (July 29, 2004) (Peck, M.J.); *Castro v. Fisher,* 04 Civ. 0346, 2004 WL 1637920 (S.D.N.Y. July 23, 2004) (Peck, M.J.); *Del Pilar v. Phillips,* 03 Civ. 8636, 2004 WL 1627220 at *7–9 (S.D.N.Y. July 21, 2004) (Peck, M.J.); *Peakes v. Spitzer,* 04 Civ. 1342, 2004 WL 1366056 at *8–10 (S.D.N.Y. June 16, 2004) (Peck, M.J.), *report & rec. adopted,* 2004 WL 1656568 (S.D.N.Y. July 23 2004) (Berman, D.J.); *Brown v. Fischer,* 03 Civ. 9818, 2004 WL 1171277 at *4–6 (S.D.N.Y. May 27, 2004) (Peck, M.J.); *Rodriguez v. Goord,* 02 Civ. 6318, 2004 WL 540531 at *10–13 (S.D.N.Y. Mar. 19, 2004) (Peck, M.J.); *Rodriguez v. Senkowski,* 03 Civ. 3314, 2004 WL 503451 at *22–24 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); *Hernandez v. Filion,* 03 Civ. 6989, 2004 WL 286107 at *8–10 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.), *report & rec. adopted,* 2004 WL 555722 (S.D.N.Y. Mar. 19, 2004) (Berman, D.J.); *Gomez v. Duncan,* 02 Civ. 0846, 2004 WL 119360 at *14–16 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *12–14 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v. Greiner,* 01 Civ. 0799, 2003 WL 22435713 at *15–17 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *McPherson v. Greiner,* 02 Civ. 2726, 2003 WL 22405449 at *12–14 (S.D.N.Y. Oct. 22, 2003) (Peck, M.J.); *Wilder v. Herbert,* 03 Civ. 0397, 2003 WL 22219924 at *4–6 (S.D.N.Y. Sept. 26, 2003) (Peck, M.J.); *Besser v. Walsh,* 02 Civ.

6775, 2003 WL 22093477 at *14 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 22681429 (S.D.N.Y. Nov. 13, 2003) (Kaplan, D.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at *7–9 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 *11–13 (S.D.N.Y. June 17, 2003) (Peck, M.J.); *Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *16–18 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Wilson v. Senkowski,* 02 Civ. 0231, 2003 WL 21031975 at *5–6 (S.D.N.Y. May 7, 2003) (Peck, M.J.); *Naranjo v. Filion,* 02 Civ. 5449, 2003 WL 1900867 at *5–7 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *8–10 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Dickens v.. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *6–8 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Figueroa v. Greiner,* 02 Civ. 2126, 2002 WL 31356512 at *5–6 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *6–8 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Velazquez v. Murray,* 02 Civ. 2564, 2002 WL 1788022 at *12–14 (S.D.N.Y. Aug. 2, 2002) (Peck, M.J.); *Soto v. Greiner,* 02 Civ. 2129, 2002 WL 1678641 at *6–7 (S.D.N.Y. July 24, 2002) (Peck, M.J.); *Green v. Herbert,* 01 Civ. 11881, 2002 WL 1587133 at *9–11 (S.D.N.Y. July 18, 2002) (Peck, M.J.); *Bueno v. Walsh,* 01 Civ. 8738, 2002 WL 1498004 at *10–11 (S.D.N.Y. July 12, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.), *aff'd,* No. 02–2540, 368 F.3d 179 (table), 2004 WL 1094269 (2d Cir. May 18, 2004); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *8–9 (S.D.N.Y. July 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *12–13 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at 8–9 (S.D.N.Y. Jan. 25,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

2002) (Peck, M.J.); *Thomas v. Breslin,* 01 Civ. 6657, 2002 WL 22015 at *4–5 (S.D.N.Y. Jan. 9, 2002) (Peck, M.J.); *Thomas v. Duncan,* 01 Civ. 6792, 2001 WL 1636974 at *7 (S.D.N.Y. Dec. 21, 2001) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *6 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Rodriguez v. Lord,* 00 Civ. 0402, 2001 WL 1223864 at *16 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at *11 (S.D.N.Y. June 8, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31426266 (S.D.N.Y. Oct. 25, 2002) (Berman, D.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *5 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411, 417 (2d Cir.2002), *cert. denied,* 537 U .S. 1245, 123 S.Ct. 1353 (2003); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01–2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 538 U.S. 978, 123 S.Ct. 1787 (2003).

Before the Court can determine whether Medina is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." *Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[FN14]

> FN14. *See also, e.g., Dallio v. Spitzer,* 343 F.3d 553, 559–60 (2d Cir.2003), *cert. denied,* 124 S.Ct. 1713 (2004); *Eze v. Senkowski,* 321 F.3d 110, 120 (2d Cir.2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.' ") (quoting *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1611 (2002)); *Christie v. Hollins,* 01 Civ. 11605, 2003 WL 22299216 at *2 (S.D.N.Y. Oct. 7, 2003) (Mukasey, D.J.) ("As Magistrate Judge Peck explained, the 'unreasonable application' clause, and AEDPA more generally, imposes a heavy burden on habeas petitioners.").

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." *Williams v. Taylor,* 529 U.S. at 404–05, 120 S.Ct. at 1519.[FN15] Both, however, "restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523.[FN16] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d at 135; *accord, e.g., DelValle v. Armstrong,* 306 F.3d at 1200.

> FN15. *Accord, e.g., Parsad v. Greiner,* 337 F.3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

175, 181 (2d Cir.2003), *cert. denied,* 124 S.Ct. 962 (2003); *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000); *Lurie v. Wittner,* 228 F.3d 113, 125 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404 (2001); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000), *cert. denied,* 531 U.S. 1116, 121 S.Ct. 865 (2001).

FN16. *Accord, e.g., Yarborough v. Alvarado,* 124 S.Ct. 2140, 2147 (U.S.2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2534 (2003); *Lockyer v. Andrade,* 538 U.S. 63, 72, 123 S.Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' "); *Tueros v. Greiner,* 343 F.3d 587, 591 (2d Cir.2003), *cert. denied,* 124 S.Ct. 2171 (2004); *Parsad v. Greiner,* 337 F.3d at 181; *DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002); *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* 537 U.S. 909, 123 S.Ct. 251 (2002); *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

**\*8** As to the "contrary to" clause:

A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

*Williams v. Taylor,* 529 U.S. at 405–06, 120 S.Ct. at 1519–20.FN17

FN17. *Accord, e.g., Price v. Vincent,* 538 U.S. 634, 123 S.Ct. 1848, 1853 (2003); *Lockyer v. Andrade,* 123 S.Ct. at 1173–74; *Tueros v. Greiner,* 343 F.3d at 591; *DelValle v. Armstrong,* 306 F.3d at 1200; *Yung v. Walker,* 296 F.3d at 135; *Kennaugh v. Miller,* 289 F.3d at 42; *Loliscio v. Goord,* 263 F .3d at 184; *Lurie v. Wittner,* 228 F.3d at 127–28.

In *Williams,* the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. at 1523. FN18 However, "[t]he term 'unreasonable' is ... difficult to define." *Williams v. Taylor,* 529 U.S. at 410, 120 S.Ct. at 1522. The Supreme Court made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.*FN19 Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. at 409, 120 S.Ct. at 1521.FN20 "Objectively unreasonable" is different from "clear error." *Lockyer v. Andrade,* 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). However, the Second Circuit has explained that "that while '[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Jones v. Stinson,* 229 F.3d at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).FN21 "[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado,* 124 S.Ct. at 2149.FN22

FN18. *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2534–35; *Parsad v. Greiner,* 337 F.3d at 181.

FN19. *See also, e.g., Yarborough v. Alvarado,* 124 S.Ct. at 2150; *Wiggins v. Smith,* 123 S.Ct. at 2535; *Price v. Vincent,* 123 S.Ct. at 1853 ("As

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

we have explained, 'a federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly." ') (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 360 (2002)); *Lockyer v. Andrade,* 538 U.S. at 75, 123 S.Ct. at 1175; *Eze v. Senkowski,* 321 F.3d at 124–25; *DelValle v. Armstrong,* 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

FN20. *Accord, e.g., Yarborough v. Alvarado,* 124 S.Ct. at 2150; *Wiggins v. Smith,* 123 S.Ct. at 2535; *Price v. Vincent,* 123 S.Ct. at 1853; *Lockyer v. Andrade,* 538 U.S. at 75, 123 S.Ct. at 1174–75; *Woodford v. Visciotti,* 537 U.S. at 25–27, 123 S.Ct. at 360–61; *Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002); *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 128–29.

FN21. *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d at 245; *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Christie v. Hollins,* 2003 WL 22299216 at *3.

FN22. The Supreme Court explained:

[T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires

considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 124 S.Ct. at 2149.

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d at 45.[FN23]

FN23. *Accord, e.g., Tueros v. Greiner,* 343 F.3d at 591; *Yung v. Walker,* 296 F.3d at 135; *see Yarborough v. Alvarado,* 124 S.Ct. at 2150–51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." *Yung v. Walker,* 296 F.3d at 134.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

*9 For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir. Apr. 20, 2004) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,' " AEDPA deference applies.); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir.2002) ("In Sellan, we found that an even more concise Appellate Division disposition—the word 'denied'—triggered AEDPA deference.").[FN24] "By its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the merits,' not to a disposition 'on a procedural, or other, ground.' Where it is 'impossible to discern the Appellate Division's conclusion on [the relevant] issue,' a federal court should not give AEDPA deference to the state appellate court's ruling." Miranda v. Bennett, 322 F.3d 171, 177–78 (2d Cir.2003) (citations omitted).[FN25] Of course, "[i]f there is no [state court] adjudication on the merits, then the pre-AEDPA, de novo standard of review applies." Cotto v. Herbert, 331 F.3d at 230.

FN24. Accord, e.g., Dallio v. Spitzer, 343 F.3d at 559–60; Parsad v. Greiner, 337 F.3d at 180–81; Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir.2003); Eze v. Senkowski, 321 F.3d at 121; Ryan v. Miller, 303 F.3d at 245; Aeid v. Bennett, 296 F.3d 58, 62 (2d Cir.), cert. denied, 537 U.S. 1093, 123 S.Ct. 694 (2002); Norde v. Keane, 294 F.3d 401, 410 (2d Cir.2002); Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir.2001).

The Second Circuit "recognize[d] that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests." Sellan v. Kuhlman, 261 F.3d at 312.

Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." Mercadel v. Cain, 179 F.3d 271, 274 (5th Cir.1999).

Sellan v. Kuhlman, 261 F.3d at 314; accord, e.g., Cotto v. Herbert, 331 F.3d at 230; Eze v. Senkowski, 321 F.3d at 121–22; Norde v. Keane, 294 F.3d at 410; Aparicio v. Artuz, 269 F.3d at 93; see also Dallio v. Spitzer, 343 F.3d at 560.

FN25. The Second Circuit in Miranda v. Bennett continued: "Generally, when the Appellate Division opinion states that a group of contentions is either without merit 'or' procedurally barred, the decision does not disclose which claim in the group has been rejected on which ground. If the record makes it clear, however, that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." Id. at 178.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)).

Here, Medina's habeas claims were decided on the merits by the § 440 court, and hence AEDPA deference applies.

II. *THE STATE TRIAL JUDGE'S FAILURE TO ORDER A COMPETENCY EXAMINATION DID NOT DEPRIVE MEDINA OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL*

A. *The Applicable Law* FN26

> FN26. For a prior decision by this Judge discussing the applicable law regarding a trial judge's duty with respect to a criminal defendant's mental competence to stand trial, *see* Johnson v. Keane, 974 F.Supp. 225, 236–40 (S.D.N.Y.1997) (Preska, D.J. & Peck, M.J.).

It is black letter law that subjecting a mentally incompetent defendant to trial violates the defendant's due process rights. Indeed, the Supreme Court has explained that this right has been recognized since the time of *Blackstone's Commentaries:*

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. Thus, Blackstone wrote that one who became 'mad' after the commission of an offense should not be arraigned for it 'because he is not able to plead to it with that advice and caution that he ought.' Similarly, if he became 'mad' after pleading, he should not be tried, 'for how can he make his defense?' 4 W. Blackstone Commentaries, *24.... [T]he prohibition is fundamental to an adversary system of justice....

**\*10** In *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), we held that [a state's] failure to

observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial.

> *Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04 (1975). FN27 Since convicting an incompetent defendant is a fundamental constitutional error, "[i]t follows as a corollary that the failure to hold a required competency hearing deprives a defendant of his constitutional right to a fair trial and renders the conviction void." *Nicks v. United States,* 955 F.2d 161, 167, 168 (2d Cir.1992); *accord, e.g., Harris v. Kuhlmann,* 346 F.3d 330, 350 (2d Cir.2003); *Griffin v. Lockhart,* 935 F.2d 926, 929 (8th Cir.1991); *Cruz v. New York,* 03 Civ. 9815, 2004 WL 1516787 at *5–6 (S.D.N.Y. July 6, 2004); *Armstrong v. Duncan,* 03 Civ. 930 & 1442, 2003 WL 22339490 at *8 (S.D.N.Y. Oct. 14, 2003). Accordingly, the federal courts have granted habeas corpus petitions where a potentially incompetent defendant was tried without a competence hearing. *E.g., Pate v.. Robinson,* 383 U.S. 375, 386, 86 S.Ct. 836, 842 (1966); *Silverstein v. Henderson,* 706 F.2d 361, 369 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195 (1983).

> FN27. *Accord, e.g., United States v. Gabb,* No. 02–1273, 80 Fed. Appx. 142, 144–45, 2003 WL 22533190 at *2 (2d Cir. Nov. 7, 2003); *United States v. Quinteri,* 306 F.3d 1217, 1232–33 (2d Cir.2002). *cert. denied,* 539 U.S. 902, 123 S.Ct. 2246 (2003); *Thomas v. New York,* No. 97–2317, 133 F.3d 907 (table), 1998 WL 2373 at *2 (2d Cir. Jan. 6, 1998); *United States v. Vamos,* 797 F .2d 1146, 1150 (2d Cir.1986), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 888 (1987).

Under New York law, an " '[i]ncapacitated person' means a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense." C.P.L. § 730.10(1). Similarly, in federal court, in determining a defendant's competency to stand trial, the "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789 (1960); *accord, e.g., United States v. Gabb,* 2003 WL 22533190 at \*2; *United States v. Zedner,* No. 01–1172, 29 Fed. Appx. 711, 712–13, 2002 WL 257224 at \*1 (2d Cir. Feb. 21, 2002); *United States v. Gomes,* No. 00–1435, 229 F.3d 1136 (table), 2000 WL 1476151 at \*1 (2d Cir. Oct. 2, 2000); *United States v. Patterson,* No. 99–1014, 189 F.3d 462 (table), 1999 WL 710216 at \*1 (2d Cir. Sept. 2, 1999), *cert. denied,* 528 U.S. 1097, 120 S.C. 839 (2000); *United States v. Nichols,* 56 F.3d 403, 410, 412 (2d Cir.1995); *Hernandez v. Ylst,* 930 F.2d 714, 716 & n. 2 (9th Cir.1990); *United States v. Oliver,* 626 F.2d 254, 258 (2d Cir.1980); *Newfield v. United States,* 565 F.2d 203, 206 (2d Cir.1977); *Etoria v. Bennett,* 292 F.Supp.2d 456, 467 (E.D.N.Y.2003) (Weinstein, D.J.); *Mead v. Walker,* 839 F.Supp. 1030, 1033 (S.D.N.Y.1993) ("The state test for incompetency" under C.P.L. § 730.10 "appears to parallel the federal one" set out in *Dusky* ). "The inquiry involves an assessment of whether the accused can assist 'in such ways as providing accounts of the facts, names of witnesses, etc.' ... But it is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is 'rational as well as factual.' ' *United States v. Hemsi,* 901 F.2d 293, 295 (2d Cir.1990).

**\*11** Criminal Procedure Law § 730 establishes the procedures by which New York courts determine whether a defendant is mentally competent to stand trial. *See Mead v. Walker,* 839 F.Supp. at 1034. C.P.L. § 730.30 provides in pertinent part that:

1. At any time after a defendant is arraigned upon an accusatory instrument other than a felony complaint and before the imposition of sentence, or at any time after a defendant is arraigned upon a felony complaint and before he is held for the action of the grand jury, the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person.

2. When the examination reports submitted to the court show that each psychiatric examiner is of the opinion that the defendant is not an incapacitated person, the court may, on its own motion, conduct a

hearing to determine the issue of capacity, and it must conduct a hearing upon motion therefor by the defendant or by the district attorney. If no motion for a hearing is made, the criminal action against the defendant must proceed. If, following a hearing, the court is satisfied that the defendant is not an incapacitated person, the criminal action against him must proceed; if the court is not so satisfied, it must issue a further order of examination directing that the defendant be examined by different psychiatric examiners designated by the director.

A defendant being tried in federal court is afforded similar protection by 18 U.S.C. § 4241:

(a) Motion to determine competency of defendant.—At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

(b) Psychiatric or psychological examination and report.—Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court....

18 U.S.C. § 4241, *see, e.g., United States v. Gabb,* 2003 WL 22533190 at \*2; *United States v. Quintieri,* 306 F.3d at 1232.

While there is some variation in the procedures used in the New York and federal courts,[FN28] the standard to be employed by the trial judge under New York or federal case law is the same. "[W]hen the demeanor of the defendant or other evidence raises doubt as to [the defendant's] competence to stand trial, it is the trial court's duty to order a hearing sua sponte." *Silverstein v. Henderson,* 706 F.2d at 367. Expressed another way, "the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

trial court must order a hearing when there is 'reasonable ground' for believing that the defendant may be incompetent to stand trial." *Id.* at 369; *accord, e.g., Pate v. Robinson,* 383 U.S. at 385, 86 S.Ct. at 842 (error for state trial court to have failed to hold a competence hearing where evidence of incompetence was presented); *United States v. Gabb,* 2003 WL 22533190 at *2; *Harris v. Kuhlmann,* 346 F.3d at 350; *United States v. Quinteri,* 306 F.3d at 1232; *United States v. Nichols,* 56 F.3d at 414 ("Neither ... 18 U.S.C. 4241 nor the Due Process Clause requires a hearing in every instance; a hearing is required only if the court has 'reasonable cause' to believe that the defendant has a mental defect rendering him incompetent."); *United States v. Kirsh,* 54 F.3d 1062, 1070 (2d Cir.), *cert. denied,* 516 U.S. 927, 116 S.Ct. 330 (1995); *Nicks v. United States,* 995 F.2d at 168; *Cruz v. New York,* 2004 WL 1516787 at *5–6; *Galandreo v. Perlman,* No. 02–CV–6799, 03–MISC–0066, 2003 WL 23198790 at *17 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.) ("As noted by the Court of Appeals for the Second Circuit, New York provides the same procedural protections required under Supreme Court law" as to competency to stand trial.); *Etoria v. Bennett,* 292 F.Supp.2d at 467–68; *Rollins v. Leonardo,* 733 F.Supp. 763, 767–68 (S.D.N.Y.1990), *aff'd,* 938 F.2d 380, 382 (2d Cir.1991); *People v. Tortorici,* 92 N.Y.2d 757, 765, 686 N.Y.S.2d 346, 350–51, *cert. denied,* 588 U.S. 834, 120 S.Ct. 94 (1999); *People v. Morgan,* 87 N.Y.2d 878, 880, 638 N.Y.S.2d 942, 943 (1995); *People v. Armlin,* 37 N.Y.2d 167, 171, 371 N.Y.S.2d 691, 695 (1975); *People v. Gonzalez,* 20 N.Y.2d 289, 293, 282 N.Y.S.2d 538, 541 (1967), *cert. denied,* 390 U.S. 971, 68 S.Ct. 1093 (1968); *People v. Smyth,* 3 N.Y.2d 184, 187, 164 N .Y.S.2d 737, 739 (1957); *People v. McPhee,* 161 Misc.2d 660, 662, 614 N.Y.S.2d 884, 885–86 (Sup.Ct. Queens Co.1994).

> FN28. For example, in New York a psychiatric examination is required if the court believes the defendant may be incapacitated, while in federal court an examination before a competency hearing is discretionary. *Compare* C.P.L. § 730.30(1) *with* 18 U.S.C. § 4241(a).

**\*12** Conversely, of course, there is no requirement to order a competency examination or hearing if the trial court has not been given reasonable cause to believe that

a defendant may be incompetent. *See, e.g., United States v. Quinteri,* 306 F .3d at 1234 & n. 10; *United States v. Nichols,* 56 F.3d at 414–15; *United States v. Kirsh,* 54 F.3d at 1070 ("the failure to conduct a full competency hearing is not a ground for reversal when the defendant appeared to be competent during trial"); *Hernandez v. Ylst,* 930 F.2d at 716 & n. 3 ("A *Pate* hearing is not required, however, absent a 'substantial' or 'bona fide' doubt of competency."); *United States v. Vamos,* 797 F.2d at 1150; *United States ex rel. Roth v. Zelker,* 455 F.2d 1105, 1108 (2d Cir.) (competency hearing not mandated "if the evidence does not warrant one"), *cert. denied,* 408 U.S. 927, 92 S.Ct. 2512 (1972); *Rollins v. Leonardo,* 733 F.Supp. at 768; *Dennis v. Turner,* 729 F.Supp. 15, 16 (S.D.N.Y.1990); *People v. Morgan,* 87 N.Y.2d at 880, 638 N.Y.S.2d at 943; *People v. Armlin,* 37 N.Y.2d at 171, 371 N.Y.S.2d at 695. Otherwise, the statute could be abused to provide an automatic continuance of the trial date at a defendant's request. *See, e.g., United States v. Nichols,* 56 F.3d at 415 ("Such a rule would allow a manipulative defendant (as Judge Korman suspected Mason to be) to bring the trial to a halt at his whim."); *United States v. Hall,* 523 F.2d 665, 667 (2d Cir.1975).

The requirement that the trial judge determine whether a defendant is competent to stand trial if there is reasonable ground for believing the defendant incompetent is required not only by the New York and federal statutes, but also by the Constitution's due process clause. *E.g., Harris v. Kuhlmann,* 346 F.3d at 349–50; *United States v. Quinteri,* 206 F.3d at 1232; *United States v. Nichols,* 56 F.3d at 416; *Nicks v. United States,* 955 F.2d at 168 (citing *Pate v. Robinson,* 383 U.S. at 385, 86 S.Ct. at 842); *United States v. Day,* 949 F.2d 973, 982 (8th Cir.1991) ("The issue framed by *Pate* and *Drope* is not whether the defendant was competent to stand trial or plead guilty, but whether the absence of a hearing on the question of his competency amounted, in the circumstances of the case, to a denial of due process."), *cert. denied,* 114 S.Ct. 2140 (1994); *Hernandez v. Ylst,* 930 F.2d at 716; *United States v. Auen,* 846 F.2d 872, 877 (2d Cir.1988); *Galandreo v. Perlman,* No. 02–CV–6799, 03–MISC–0066, 2003 WL 23198790 at *17 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.).

The determination of whether there is "reasonable

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

cause" to believe a defendant may be incompetent rests in the discretion of the trial judge. *See, e.g., United States v. Gabb,* 2003 WL 22533190 at *2; *United States v. Quintieri,* 306 F.3d at 1232–33; *United States v. Nichols,* 56 F.3d at 414; *United States v. Vamos,* 797 F.2d at 1150; *Newfield v. United States,* 565 F.2d at 206; *People v. Tortorici,* 92 N.Y.2d at 766, 686 N.Y.S.2d at 351; *People v. Morgan,* 87 N.Y.2d at 89, 638 N.Y.S.2d at 943.[FN29]

> FN29. For the procedural safeguards required by statute and Constitutional due process to be effective, however, the trial court "must necessarily exercise its discretion and make findings on the record concerning the defendant's competency where the facts presented to the court warrant such an inquiry." *United States v. Auen,* 846 F.2d at 877–78; *see also, e.g., United States v. Garrett,* 903 F.2d 1105, 1116 (7th Cir.1990).

**\*13** The Supreme Court has recognized that there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Drope v. Missouri,* 420 U.S. at 180, 95 S.Ct. at 908.[FN30] The Supreme Court, however, has recognized some of the factors that the trial court should consider: "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but even one of those factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri,* 420 U.S. at 180, 95 S.Ct. at 908; *see also, e.g., United States v. Gabb,* 2003 WL 22533190 at *2 ("[A] district court must consider many factors when determining whether it has 'reasonable cause' to order a competency hearing.... 'A district court also often orders and reviews psychiatric records when determining whether to hold a hearing.' "); *United States v. Estrada,* Nos. 00–1189, 03–1139, 59 Fed. Appx. 372, 374, 2003 WL 562291 at *2 (2d Cir. Feb. 28, 2003), *cert. denied,* 124 S.Ct. 552 (2003); *United States v. Quinteri,* 306 F.3d at 1233 ("A district court also often orders and reviews psychiatric records when determining whether to hold a hearing."); *United States v. Nichols,* 56 F.3d at 411 ("In making a determination of competency, the [trial] court may rely on a member of factors, including medical

opinion and the court's observation of the defendant's compartment."); *United States v. Day,* 949 F.2d at 982 (factors include "any evidence of [defendant's] irrational behavior, his demeanor before the trial court, available medical evaluations, and whether trial counsel questioned the defendant's competency before the court."); *United States v. Hemsi,* 901 F.2d at 295–96 ("the court may take account of a number of factors, including the defendant's comportment in the courtroom."); *Etoria v. Bennett,* 292 F.Supp.2d at 467 ("Three relevant areas of inquiry include defendant's irrational behavior, his demeanor at trial, and medical opinion."); *People v.. Tortorici,* 92 N.Y.2d at 766, 686 N.Y.S.2d at 351; *People v. Morgan,* 87 N.Y.2d at 880–81, 638 N.Y.S.2d at 943–44.

> FN30. *Accord, e.g., Harris v. Kuhlmann,* 346 F.3d at 350; *United States v. Quintieri,* 306 F.3d at 1233; *Silverstein v. Henderson,* 706 F.2d at 369.

In addition, "deference is owed to the [trial] court's determinations based on observation of the defendant during the [pretrial and trial] proceedings." *United States v. Vamos,* 797 F.2d at 1150; *see also, e.g., United States v. Gabb,* 2003 WL 22533190 at *2; *Harris v. Kuhlmann,* 346 F.3d at 355; *United States v. Quintieri,* 306 F.3d at 1233; *United States v. Nichols,* 56 F.3d at 414; *United States v. Kirsh,* 54 F.3d at 1070 (trial court's "view of the defendant's competency based on its observations at trial is entitled to deference"); *United States v. Oliver,* 626 F.2d at 259 (trial judge "justifiably relied on his extended observations of [the defendant] in deciding that he had sufficient mental capacity to stand trial").[FN31]

> FN31. This is especially so where the trial judge questions the defendant (outside the jury's presence) to explore defendant's competency. *See, e.g., United States v. Oliver,* 626 F.2d at 259; *People v. Russell,* 74 N.Y.2d 901, 902, 549 N.Y.S.2d 646, 647, 548 N.E.2d 1297, 1298 (1989) (trial judge's direct questioning of the defendant along with his overall ability to observe defendant at trial, supported finding of competence).

**\*14** Defense counsel's opinion as to defendant's

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

competence or incompetence also is an important factor to consider. As the Second Circuit has pointed out, "since competency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence." *United States v. Vamos,* 797 F.2d at 1150; *see, e.g., Drope v. Missouri,* 420 U.S. at 177 n .13, 95 S.Ct. at 906 n. 13 ("Although we do not, of course, suggest that courts must accept without question a lawyer's representation concerning the competence of his client, ... an expressed doubt in that regard by one with 'the closest contact with the defendant' ... is unquestionably a factor which should be considered."); *United States v. Gabb,* 2003 WL 22533190 at *3; *United States v. Estrada,* 2003 WL 562291 at *2; *United States v. Quintieri,* 306 F.3d at 1233; *United States v. Kirsh,* 54 F.3d at 1071 (quoting *Vamos* ); *United States v. Day,* 949 F.2d at 982 (factors include "whether trial counsel questioned the defendant's competency before the court"); *Griffin v. Lockhart,* 935 F.2d at 930, 931; *Hernandez v. Ylst,* 930 F.2d at 718 ("While the opinion of [defendant's] counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings."); *United States v. Renfroe,* 825 F.2d 763, 767 (3d Cir.1987) ("Other factors [besides the factors listed in *Drope* ] relevant to the [competency] determination may include an attorney's representation about his client's competency."); *United States ex rel. Roth v. Zelker,* 455 F.2d at 1108 (the "opinion of a defendant's attorney as to his ability to understand the nature of the proceedings and to cooperate in the preparation of his defense, is indeed significant and probative.").[FN32]

FN32. *See also, e.g., Lopez v. Walker,* 239 F.Supp.2d 368, 374 (S.D.N.Y.2003) ("[G]iven the frequency and nature of contact between attorney and client, an attorney has perhaps the greatest opportunity to notice any behavior that might signify incompetence in his client. Thus, defense counsel's inaction with regard to his client's competency is particularly strong evidence of defendant's mental state."); *People v. Morgan,* 87 N.Y.2d at 880, 638 N.Y.S.2d at 943–44, 662 N.E.2d at 261–62 (counsel's

opinion is a factor but it does not "serve as an automatic substitute for the court's statutory discretion"); *People v. Gelikkaya,* 84 N.Y .2d 456, 460, 618 N.Y.S.2d 895, 897, 643 N.E.2d 517, 519 (1994) (noting that "defense counsel ... was in the best position to assess defendant's capacity").

Finally, the Supreme Court has held that even when a defendant is deemed competent at the beginning of the case, a trial court must always be aware of circumstances pointing to a change in defendant's competency. *Drope v. Missouri,* 420 U.S. at 182, 95 S.Ct. at 908 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").[FN33]

FN33. *See, e.g., United States v. Mason,* 52 F.3d 1286, 1292–93 (4th Cir.1995) (defendant's suicide attempt after first phase of defendant's trial required court to hold competency hearing not only as to defendant's competence to continue trial but also as to his competence at already concluded first part of trial); *United States v. Auen,* 846 F.2d at 878; *United States v. Renfroe,* 825 F.2d at 766 (because "statute permits motions to determine competency 'at any time after the commencement of prosecution for an offense and prior to the sentencing of the defendant ...,' [t]he request for a hearing to determine [defendant's] competency at trial was, therefore, timely and should have been addressed by the [trial] court."); *Etoria v. Bennett,* 292 F.Supp.2d at 468; *People v. Colon,* 128 A.D.2d 422, 423, 512 N.Y.S.2d 809, 810 (1st Dep't 1987).

B. *Application of These Legal Principles to Medina's Habeas Claim*

Medina's habeas petition, as did his C.P.L. § 440 motion, claims that his prison medical records show that he was incompetent at the time of trial. (*E.g.,* Dkt. No. 1: Pet. ¶ 12(B) ("The prison medical records clearly state the various severe psychiatric problems of the defendant and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

the regimen of powerful p[s]ychotropic drugs being taken by the defendant that rendered him incapacitated before and during trial and sentencing.").)

**\*15** The problem with Medina's argument—implicitly recognized in his ineffective assistance claim—is that it is undisputed that this medical evidence was not before the trial judge at the time of trial and/or sentencing, and thus cannot be considered on habeas review. *See, e.g., United States v. Gabb,* No. 02–1273, 80 Fed. Appx. 142, 144–45, 2003 WL 22533190 at \*2 (2d Cir. Nov. 7, 2003) ("[T]he question of competency and reasonable cause to doubt it must focus on the defendant's abilities *at the time of trial,* not any conduct discovered or analyzed after the fact."); *Harris v. Kuhlmann,* 346 F.3d 330, 350 (2d Cir.2003) ("Of course, '[i]t is axiomatic that in reviewing whether this obligation [to order a competency hearing] was properly discharged only evidence before the court at the time its decision was made is pertinent.'"); *Graham v.. Portuondo,* Nos. 03–MISC–0066, 01–CV–6911, 2003 WL 23185715 at \*7 (E.D.N.Y. Oct. 30, 2003) (Weinstein, D.J.) ("In order to find abuse of discretion in failing to order a competency hearing, a reviewer must evaluate the record and evidence available to the trial judge."); *United States v. Berger,* 188 F.Supp.2d 307, 325 (S.D.N.Y.2002); *Collazo v. United States,* 98 Civ. 7059, 1999 WL 335146 at \*4–5 (S.D.N.Y. May 26, 1999).

This Court therefore looks to the information that was before the trial judge. As noted above, defense counsel's opinion as to defendant's competence or incompetence is an important factor to consider. (*See* cases cited at pages 30–31 above.) Here, Medina's trial counsel did not ask the trial court to hold a C.P.L. § 730.30 hearing as to Medina's competency. To the contrary, Medina's trial counsel found Medina to be competent to assist in his defense, as he explained in the affidavit he submitted in response to Medina's C.P.L. § 440 motion:

19. As regards the first question, the Court should be assured that, from the beginning of my representation, I was not unmindful of the fact that Defendant Mr. Medina had psychological problems. From speaking with various family members, I learned of his psychiatric history. I learned that he suffered from a variety of psychiatric maladies. I also learned, however, that while these various maladies

may have manifested themselves in different ways, none of these ailments ever led me to believe in any manner whatsoever that Mr. Medina was unable to understand the nature of the proceedings or to assist in his own defense.

....

21. From the outset, Mr. Medina indicated to me that he fully understood the proceedings that were taking place. He knew why he had been charged. He knew with what he had been charged. He specifically recalled the night of the shooting. And though at various times over the course of my representation, Mr. Medina provided me with a number of different alibis and with a number of possible defenses and/or excuses for his actions, neither his words or action exhibited to me that he lacked, in any way whatsoever, an understanding of his case and of his situation.

**\*16** 22. Likewise, all through the proceedings, and particularly at trial, Mr. Medina attempted to assist in his own defense. As I recall, he was familiar with most of the people who were mentioned in the various police reports provided in discovery. For example, when we discovered that an individual named "Irizarry" was likely to be called a witness against him, Mr. Medina prepared a list of questions for me to ask this person upon cross-examination. I have annexed a copy of Mr. Medina's cross-examination questions for this individual as Exhibit "B".

23. Your honor should be aware that Mr. Medina was fully cognizant of all of the sentencing possibilities that the case presented. Review of my notes indicates that, at least at one point, Mr. Medina stated to me that he would accept a negotiated disposition which carried with it a term of ten years' incarceration. When the prosecutor would not agree, however, we did not broach the subject again.

24. What was evident, at least to my untrained eye, was that Mr. Medina had no sense of the gravity of the crime. Upon reflection brought on by my review of my file in preparation of the affirmation, I recall

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

that Mr. Medina never referred to the victim of the crime as anything other than "the Cuban," or "the Old Cuban." His attitude always seemed to be, at least in my discussions with him, that neither the police nor the prosecutors were as smart as he was.

25. During my representation of Mr. Medina, I was not unmindful, however, that Mr. Medina did possess some psychiatric problems. I knew of some of his history through speaking with him as well as certain friends and family members. Indeed, at one point, I was considering some type of "diminished capacity" defense. Early on in the case, I consulted with a psychiatrist, Dr. Sanford Drab. After Dr. Drab's review of the case, I made the decision to proceed with a more straightforward defense.

26. The Court should note, however, that *at no time* during my meetings with Mr. Medina prior to or during trial, did he appear to me to be in a "subdued torpor" (Memorandum submitted in support of Defendant's 440.10 Motion, page 6). Nor do I recall him ever appearing to be in a "heavily medicated and sedated state" (memorandum, page 6), or a "stupefied state" (Memorandum, page 7).

(1/24/03 Affidavit of Medina's trial counsel, Anthony R. Dellicarri, ¶¶ 19–26, attached as Ex. 1 to 3/5/03 Aff. of A.D.A. Zaharah R. Markoe in Opposition to Medina C.P.L. § 440 Motion.) *See, e.g.,* Graham v. Portuondo, Nos. 03–MISC–0066, 01–CV–6911, 2003 WL 23185715 at *7 (E.D.N.Y. Oct. 30, 2003) (Weinstein, D.J.); Collazo v. United States, 98 Civ. 7059, 1999 WL 335146 at *4–5 (S.D.N.Y. May 26, 1999).

The trial judge nevertheless would have had a duty to *sua sponte* order a competency examination of Medina, if Medina's demeanor or other evidence raised doubt as to his competence. (*See* cases cited at pages 26–27 above.) The fact that defense counsel did not request such a hearing is one factor. Justice Fisch made clear in denying Medina's C.P.L. § 440 motion that he had no reason to question Medina's competency:

**\*17** The record, in the instant case, is devoid of any information that would have suggested to this Court

that the defendant was not fit to proceed. In fact, the record demonstrates the contrary, and reveals many instances of the defendant's obvious participation in the proceedings and awareness of what was taking place....

In the instant case, the defendant's purported mental state was never brought to the attention, nor obviously apparent to the trial Court, thus failing to raise a doubt regarding the defendant's competence. The defendant did not manifest by words or actions any reason for this Court to believe nor even suspect that he was not competent to stand trial. The defendant's appearance was that of an active, rational participant throughout his entire trial, in full comprehension of the proceedings. He executed a written waiver of his right to be present during sidebar conferences, consulted with his attorney regarding jury selection and actions to be taken with regard to specific jurors. He prepared written questions for his attorney to use during cross examination, consulted with his attorney regarding the introduction of evidence during trial and had his attorney inform the court of his personal needs during trial. All these actions demonstrated to the Court that the defendant understood the nature of the proceedings and was able to assist in his defense. The Court had no reasonable grounds to believe the defendant was not competent to stand trial.

(10/22/03 Justice Fisch Order at 3.) *See, e.g.,* Collazo v. United States, 1999 WL 335146 at *4 ("A court's determination that a defendant is competent may be based on ... the court's own observations of the defendant, even where there is evidence of the defendant's low intelligence, prior history of heavy drug use, lapses of memory, and unresponsiveness."); People v. Tortorici, 92 N.Y.2d 757, 765, 686 N.Y.S.2d 346, 350 (1999) (A "defendant's history of psychiatric illness does not in itself call into question defendant's competence to stand trial.").

As noted above, deference is owed to the trial court's determination based on observation of the defendant at the time of trial. (*See* cases cited at pages 30–31 above.) The record is clear—and essentially Medina does not claim otherwise—that there was no information before the trial judge at the time of trial and/or sentencing that would have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

required him to order a competency hearing for Medina. *See, e.g., United States v. Gabb,* No. 02−1273, 80 Fed. Appx. 142, 145−46, 2003 WL 22533190 at *2−3 (2d Cir. Nov. 7, 2003); *Harris v. Kuhlmann,* 346 F.3d 330, 355 (2d Cir.2003); *United States v. Quintieri,* 306 F.3d 1217, 1233 (2d Cir.2002); *United States v. Nichols,* 56 F.3d 403, 414 (2d Cir.1995); *United States v. Kirsh,* 54 F.3d 1062, 1070 (2d Cir.1995); *United States v. Oliver,* 626 F.2d 254, 259 (2d Cir.1980).

While Medina's habeas petition, as did his C.P.L. § 440 motion, relies on a "chronology" based on his medical records (Dkt. No. 1: Farrell Aff. ¶ 7; Medina C.P.L. § 440 Motion, Farrell Aff. ¶ 9), the medical records were obtained only after the trial, via a F.O.I.L. request. (*See* Medina C.P.L. § 440 Motion Ex. 1: Medina 9/16/02 Aff. ¶¶ 2–3.) A review of the medical records, moreover, reveals assessments that Medina was alert, cooperative and fully oriented, with "logical," "relevant" and "goal directed" thought processes. [FN34] Medina's habeas petition, like his C.P.L. § 440 motion, also relies on an affidavit from Dr. Richard Dudley, who did not examine Medina but reviewed Medina's medical records. (Medina C.P.L. § 440 Motion Ex. 2: Dudley 9/30/02 Aff. ¶ 5.) Dr. Dudley does not come to any conclusion with a reasonable degree of medical (psychiatric) certainty. Rather, his opinion is that certain things were "likely" to or "could have" affected Medina. (*See* Dudley Aff. ¶¶ 6, 9.) This Court finds Justice Fisch's analysis persuasive:

> FN34. *E.g.,* Medina C.P.L. § 440 Motion, Medical Records, Ex. B (3/3/97 at p. 413–18), Ex. C (2/15/97 at p. 430–33), Ex. I (2/24/98 at p. 502–09), Ex. N (1/30/99 at p. 574 (Medina alert, making progress and looking to the future)), Ex. N (2/17/99 at p. 580 (Medina alert and cooperative, stable in general population housing)), Ex. O (3/16/99 at p. 587 (Medina "clinically & mentally stable")), Ex. V (5/99 to 6/1/99 at p. 615–20 (shortly after sentencing, Medina is "stable on medication," "speech clear & coherent." Judgment & impulse control adequate.").

**\*18** Another argument proffered by the defendant is that he was so heavily medicated he was unable to understand the nature of the proceedings. To support this claim, defendant has attached medical records as well as an affidavit from Dr. Richard G. Dudley regarding his mental state. While a review of the medical records does indicate that the defendant was medicated at various times, Dr. Dudley never personally examined nor observed the defendant in this medicated condition. Dr. Dudley's assessment of the defendant's mental state, at the time of the trial, is based solely on a review of medical records. Such records contain many entries, on various dates, in the months immediately prior to the hearing and trial where the observation notes reveal the following: Defendant was alert, his speech was "clean and coherent," he had "good eye contact," and no "delusions." On March 16, 1999, shortly before the pre-trial hearings began, the medical records indicate the defendant "appeared to be clinically and mentally stable and not distressed." While there are requests for medication by the defendant during the time period of these observations, at most they refer to the defendant being anxious and depressed but not mentally incompetent. All of these observation notes were made by medical professionals who had direct contact with the defendant, thus providing them the best opportunity to assess his medical condition.... The defendant, despite the medication, assisted in his defense.

(10/22/03 Justice Fisch Order at 5–6.) *See, e.g., United States v. Gabb,* 2003 WL 22533190 at *3 ("The district court's contemporaneous assessment of the appellant's competence can, within the discretion afforded to it, outweigh the reliability of a report produced by a psychiatrist who first met with the appellant seven months after conviction, such that the district court could find no reasonable cause to trigger the hearing requirement of § 4241."); *United States v. Zelker,* 355 F.Supp. 1002, 1008 (S.D.N.Y.1972) (The court-appointed psychiatrist's "examination of petitioner consisted of a review of petitioner's past history, the court records, and interviews with petitioner years after the events in question took place. He admitted that the Bellevue finding of 'no psychosis' was not consistent with his own findings.... It seems clear that petitioner was fit to stand trial ..."),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

aff'd, 474 F.2d 1336 (2d Cir.1973). In addition, the Court risks repetition but notes that neither the medical records nor Dr. Dudley's affidavit were presented to the trial judge (or known to Medina's trial counsel) at the time of trial and sentencing. Thus, even if Dr. Dudley's analysis of the medical records were correct, since the information was not presented to the trial judge before (or during) trial, the trial judge was not required to order a competency hearing.

Medina also argues that he was incompetent at the time of his sentencing on May 14, 1999, because he was on both Thorazine and Zyprexa, which in combination (according to Dr. Dudley) act as sedatives. (See Dkt. No. 1: Farrell Aff. at 24; see also Medina C.P.L. § 440 Motion Ex. 2: Dudley Aff. ¶ 9.) Medina cites Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810 (1992), in making his argument. (Dkt. No. 1: Farrell Aff. at 24–25.) As Justice Kennedy noted in his concurring opinion in Riggins:

> **\*19** [S]erious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character.

Riggins v. Nevada, 504 U.S. at 143–44, 112 S.Ct. at 1819 (Kennedy, J., concurring). "Certainly, the improper administration of psychiatric medicine can render an individual temporarily incompetent." United States v. Quintieri, 306 F.3d 1217, 1233 (2d Cir.2002). Medina points to the fact that at sentencing, the judge noted that Medina made "no demonstration to either the Probation Department ... or a statement to me to make any type of contrition or any remorse for what happened." (Dkt. No. 1: Farrell Aff. at 24, quoting Sentencing Transcript at 20, which has not been provided to the Court.) In this case, however, there was no evidence before Justice Fisch at the time of Medina's sentencing to indicate that Medina was sedated by medication or otherwise incompetent. (Indeed, Medina's lack of expression of remorse is also consistent with his continued claim of innocence.) See, e.g., United States v. Quintieri, 306 F.3d at 1233–34 (Assurances by defense counsel, "combined with the court's own

observations, overcome any reasonable doubt as to the defendant's competence that may have been raised by his statement that he felt dizzy" at time of sentencing.); Chichakly v. United States, 926 F.2d 624, 631–32 (7th Cir.1991) (Despite defendant's allegations that he was incompetent due to psychiatric medications, "[t]here is certainly no need to conduct a competency hearing when there is no evidence before the Court of incompetency and when the defense attorney failed to request one and neither the prosecuting attorney nor the judge saw a need for one."); Lopez v. Walker, 239 F.Supp.2d 368, 374 (S.D.N.Y.2003) (Defendant's "pre-sentence report made reference to his prior suicide attempts, hospitalization, and use of the drug Sinequan." However, "in spite of the information contained" in the report, the court was not required to make a further inquiry into defendant's competency since the defendant presented himself as "coherent and rational, as well as an active participant in his own case."); Thomas v. Senkowski, 968 F.Supp. 953, 956 (S.D.N.Y.1997) (Petitioner found fully competent to plead guilty although under the influence of heavy anti-psychotic drugs at the time.).

Finally, this Court must review Justice Fisch's determination under the deferential AEDPA review standard. The Court cannot say that Justice Fisch's determination that there was no evidence requiring him to sua sponte order a competency hearing was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as required by the AEDPA, 28 U.S.C. § 2254(d)(2), nor an unreasonable application of clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1). See, e.g., Harris v. Kuhlmann, 346 F.3d 330, 352, 355 (2d Cir.2003) ("Considering all of the evidence before the state trial court at the time of the October 17, 1984 hearing, we cannot conclude that it was objectively unreasonable for the court to have denied Harris's motion for a competence hearing."); Armstrong v. Duncan, 03 Civ. 930, 2003 WL 22339490 at \*9 (S.D.N.Y. Oct. 14, 2003) (" 'The determination of whether reasonable doubt exists as to a defendant's fitness to stand trial ... has generally been held to be an issue of fact entitled to deference by a federal habeas corpus court.' ... In light of the trial court's 'superior opportunity' to observe the Petitioner in court, ... the contents of the psychiatric reports, and defense

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

counsel's own failure to raise concerns about Petitioner's competency, this Court cannot say that the state court unreasonably applied federal law in determining that Petitioner was fit to stand trial."). *Lopez v. Walker,* 239 F.Supp.2d at 375 ("The determination of competency is an issue of fact, entitled to deference upon federal habeas review."); *Bisnett v. Kelly,* 221 F.Supp.2d 373, 388 (E.D.N.Y.2002) (Raggi, D.J.); *see also* cases cited at pages 29–31 above.

**\*20** Accordingly, Medina's habeas claim that he was denied due process because he was not competent at the time of trial and sentencing (Pet.¶ 12(B)) should be *DENIED.*

III. *MEDINA'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED*

A. *Strickland v. Washington Standard On Ineffective Assistance of Counsel* [FN35]

FN35. For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel in language substantially similar to this section of this Report & Recommendation, *see Smalls v. McGinnis,* 04 Civ. 0301, 2004 WL 1774578 at *13–15 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.); *Gillespie v. Miller,* 04 Civ. 0295, 2004 WL 1689735 at *14–16 (S.D.N.Y. July 29, 2004) (Peck, M.J.); *Rodriguez v. Senkowski,* 03 Civ. 3314, 2004 WL 503451 at *39 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); *Gomez v. Duncan,* 02 Civ. 0846, 2004 WL 119360 at *27 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *22–24 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v. Greiner,* 01 Civ. 799, 2003 WL 22435713 at *26–28 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at *32–34 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at *9–12 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *33–35 (S.D.N.Y. June 17, 2003) (Peck, M.J.);

*Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *18–19 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *14–16 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *26–28 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.); *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *13–14 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *9–11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *16–19 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *9–11 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *15–17 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Ennis v. Walker,* 00 Civ. 2875, 2001 WL 409530 at *15–16 (S.D.N.Y. Apr. 6, 2001) (Peck, M.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01–2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *16 (S.D.N.Y. Nov. 17, 1999) (Peck, M.J.); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 370 (S.D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); *Santos v. Greiner,* 99 Civ. 1545, 1999 WL 756473 at *7 (S.D.N.Y. Sept. 24, 1999) (Peck, M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 133–34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Torres v. Irvin,* 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Boyd v. Hawk,* 965 F.Supp. 443, 449 (S.D.N.Y.1997) (Batts, D.J. & Peck, M.J.).

1. *Strickland and Trial Counsel*

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064; *accord, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2535 (2003). This performance is to be judged by an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2064.[FN36]

> FN36. *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2535; *Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 1850 (2002).

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).[FN37]

> FN37. *Accord, e.g., Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001).

Second, the defendant must show prejudice from counsel's performance. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068–69. Put another way, the "defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.[FN38]

> FN38. *See also, e.g., Wiggins v. Smith,* 123 S.Ct. at 2542; *Bell v. Cone,* 535 U.S. at 695, 122 S.Ct. at 1850; *Aparicio v. Artuz,* 269 F.3d at 95; *Sellan v. Kuhlman,* 261 F.3d at 315; *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,* 519 U.S. 824, 117 S.Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068; *accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2542. The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." *Strickler v. Greene,* 527 U.S. 263, 289–91, 119 S.Ct. 1936, 1952–53 (1999); *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565–66 (1995); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland* "); *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." *Strickler v. Greene,* 527 U.S. at 291, 119 S.Ct. at 1953; *cf. id,* at 297–301, 119 S.Ct. at 1955–58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

*v. Washington,* 466 U.S. at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" ' *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland v. Washington,* 466 U.S. at 695–96, 104 S.Ct. at 2069); *accord, e.g., Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991).

**\*21** The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069.[FN39]

> FN39. *Accord, e.g., Smith v. Robbins,* 528 U.S. 259, 286 n. 14, 120 S.Ct. 746, 764 n. 14 (2000).

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066.[FN40]

> FN40. *See also, e.g., Yarborough v. Gentry,* 124 S.Ct. 1, 5–6 (2003); *Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1575 (1982) ( "We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) ("In

reviewing *Strickland* claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on ... counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81 (1994).

As the Second Circuit noted: "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d at 199.

### 2. *Strickland and the AEDPA Review Standard*

For purposes of this Court's AEDPA analysis, "the *Strickland* standard ... is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" ' *Aparicio v. Artuz,* 269 F.3d at 95 & n. 8 (quoting 28 U.S.C. § 2254(d)(1)).[FN41] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" ' *Aparicio v. Artuz,* 269 F.3d at 95 n. 8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.... Rather, he must show that the [First Department] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone,* 535 U.S. at 698–99, 122 S.Ct. at 1852; *see also Yarborough v. Gentry,* 124 S.Ct. 1, 4 (2003).

> FN41. *See also, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2535 (2003); *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 1852 (2002); *Sellan v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Kuhlman, 261 F.3d at 315.

B. *Medina's Ineffective Trial Counsel Claims Should Be Denied*

Medina asserts that his trial counsel erred by failing to: (1) request a C.P.L. § 730.20 competency hearing; (2) investigate Medina's medical and psychiatric history, (3) retain a private investigator, (4) interview a potentially exculpatory witness, and (5) properly impeach the prosecution's key witness, Cepero. (Dkt. No. 1: Pet. ¶ 12(A); *see* Dkt. No. 1: Medina Br. at 11–22.)

In denying Medina's C.P.L. § 440 motion, Justice Fisch stated:

> The defendant has failed to establish the representation he received throughout the trial was so deficient that his attorney was not functioning within the acceptable professional standards required for counsel. The Court is hard pressed to find the trial strategy of [defense counsel] Mr. Dellicarri deficient when the defendant was acquitted of the top charge of Murder in the Second Degree and found guilty of the lesser charge of Manslaughter in the First Degree. Although the Court is mindful of the defendant's argument that it is the combination of errors that rise to the level of ineffectiveness, based on the trial record and the factual allegations contained in this motion, the defendant has not met his burden. It is apparent from the affidavit of Mr. Dellicarri, a seasoned practitioner, with over twenty years of criminal trial experience, as well as from the observations of this Court that the defendant was an active participant in his defense. He participated both in and out of Court, never presenting his attorney or this Court reason or pause to question his mental state. Mr. Dellicarri engaged in vigorous cross examination of the main prosecution witness which likely played a role in the defendant's acquittal on the top charge of Murder in the Second Degree. Mr. Dellicarri also made a strategic decision not to call a witness to testify to the mere fact that she did not hear a gunshot since there was no disputed issue regarding the cause of death. The Court will not confuse the strategic trial decisions made by Mr. Dellicarri, as a zealous advocate on behalf of the defendant, with

deficient representation. A review of the evidence, the law and the circumstances of the case at the time of representation, clearly compels the finding that defendant received meaningful representation.

**\*22** (10/22/03 Justice Fisch Order at 7–8; *see also id.* at 4–7.) [FN42]

> [FN42]. In addition to the trial court's description of Dellicarri as a "zealous advocate," Medina sent Dellicarri a letter in order to "tell [Delicarri] thanks [Medina] felt [he] was represented perfect ." (3/5/03 A.D.A. Markoe Aff. in Opp. to Medina C.P.L. § 440 Motion, Ex. 1: Dellicarri Aff. Ex. A: Letter from Medina.) Medina also wrote to Delicarri, "your [sic] a wonderful lawyer" and "I think your [sic] the best." (*Id.*)

For the reasons discussed below, Medina's ineffective assistance of trial counsel claim should be *DENIED*.

1. *Defense Counsel's Alleged Failure to Request a Competency Hearing and Investigate Medina's Medical and Psychiatric History*

Medina asserts that his trial counsel, Dellicarri, "failed to be aware of [Medina's] medical and psychological distress." (Dkt. No. 1: Medina Br. at 18.) Specifically, Medina claims that:

a. Defense counsel told [Medina] to pay attention several times during the pretrial hearing and trial. [Medina] informed defense counsel that [he] could not pay attention and all [he] wanted to do was sleep.

b. Defense counsel never requested information from [Medina] concerning [his] ongoing medical or psychiatric treatment during the course of trial.

c. Defense counsel never investigated [Medina's] medical and psychiatric history prior to incarceration.

d. Defense counsel never requested a psychiatric exam to determine whether [Medina] had a mental disease or defect excluding fitness to proceed.

(Medina C.P.L. § 440 Aff. ¶ 6.) However, defense

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

counsel Dellicarri's affidavit in opposition to Medina's C.P.L. § 440 motion stated that he was aware of Medina's "psychological problems" and "psychiatric history" through conversations with "various family members." (3/5/03 A.D.A. Markoe Aff. in Opp. to C.P.L. § 440 Motion, Ex. 1: Dellicarri Aff. ¶¶ 19, 25.) After considering raising a "diminished capacity" defense and consulting a psychiatrist in this regard, Dellicarri determined that Medina's mental health problems did not rise to the level of incompetency or diminished capacity. (Dellicarri Aff. ¶¶ 19, 25.) Dellicarri stated that "none of these [psychiatric] ailments ever led [him] to believe in any manner whatsoever that Mr. Medina was unable to understand the nature of the proceedings or to assist in his own defense.... From the outset, Mr. Medina indicated to [Dellicarri] that he fully understood the proceedings that were taking place.... Likewise, all through the proceedings, and particularly at trial, Mr. Medina attempted to assist in his own defense." (Dellicarri Aff. ¶¶ 19, 21, 22.)

According to Justice Fisch:

Mr. Dellicarri asserts that [Medina] never indicated he did not understand the proceedings, and indeed made efforts to assist in his defense, both prior to, and during trial. [Medina] suggested several alibis to be used for his defense, participated in plea negotiations, and prepared cross examination questions for a witness. During the trial, [Medina's] appearance never gave defense counsel cause for concern. Counsel refutes the claims in [Medina's] motion that [Medina] was in a 'subdued torpor' or in a 'heavily medicated or sedated state,' during trial.

(10/22/03 Justice Fisch Order at 5.) Since Dellicarri was able to communicate with Medina and Dellicarri had no reason to suspect that Medina's mental disease rose to the level of incompetence, it was not unreasonable for Dellicarri to not request a competency hearing. *See, e.g., Etoria v. Bennett,* 292 F.Supp.2d 456, 472 (E.D.N.Y.2003) (Weinstein, D.J.) (defendant "did not act unusually during the proceedings and he did nothing either volitionally or involuntarily to alert his lawyer to the fact that he was not competent."); *Dennis v. Turner,* 729 F.Supp. 15, 17 (S.D.N.Y.1990) ("Given the absence of any evidence indicating Dennis' competency was in doubt

at the time of trial, counsel for Dennis obviously will not be presumed to have represented Dennis deficiently in failing to request a competency hearing."). As discussed in Point II.B above, Medina's arguments based on the medical records and Dr. Dudley's affidavit must be rejected because defense counsel did not have that information, and this Court agrees with Justice Fisch that based on defense counsel's knowledge, he was not ineffective for not investigating Medina's psychological problems more than he did. Moreover, even if this Court would rule otherwise if it had been the C.P.L. § 440 court (which it would not), under the deferential AEDPA review standard, this portion of Medina's ineffective assistance of counsel claim should be *DENIED*.

*2. Counsel's Alleged Failure to Retain a Private Investigator and Properly Investigate*

**\*23** Medina claims that his trial counsel erred by failing to hire a private investigator to measure the distance between Cepero and 932 Intervale Avenue on the night of the incident, which Medina alleges would have cast doubt upon Cepero's ability to see Medina leave the club with a gun. (Dkt. No. 1: Medina Br. at 13–15.)

Medina relies on *Thomas v. Kuhlman,* 255 F.Supp.2d 99 (E.D.N.Y.2003) (Weinstein, D.J.), to support his claim that Dellicarri should have pursued a more in depth investigation in a one-witness homicide. (See Dkt. No. 1: Medina Br. at 12–13.) That case is distinguishable. In *Thomas v. Kuhlman,* trial counsel failed to investigate the crime scene where a key witness testified that she saw the petitioner standing on a fire escape of the murder victim's building shortly before the victim was killed. *Thomas v. Kuhlman,* 255 F.Supp.2d at 101. It was later undisputedly determined that "it was physically impossible for the witness to have seen defendant at the victim's window, since ... [it] was not visible from her vantage point." *Id.* Judge Weinstein found that "under the circumstances of [that] case," where the defendant was "[c]harged with second-degree murder ... and the case against him hinged crucially on the testimony of one eyewitness [t]hat circumstance alone should have been enough to put counsel on notice that he had an obligation to see for himself what the crime scene looked like." *Id.* at 110. In *Thomas,* "[i]f defense counsel had made a proper investigation prior to trial ... he would have been able to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

deal significant blows to the prosecution's case...." *Id.* at 109.

Medina's case is clearly distinguished from *Thomas v. Kuhlman* because defense counsel Dellicarri thoroughly examined the issue of Cepero's distance from the social club during trial and established through cross-examination of Cepero and the police officers that Cepero was two or three times as far away from the social club as he claimed he was. (*See* pages 9–10 above.) During Cepero's cross-examination, Dellicarri walked to the back of the courtroom in order to ascertain whether he was standing as far away from Cepero as Medina was on the night of the incident. (*See* pages 9–10 above.) Cepero responded that his distance from Medina on that night was about "half a courtroom" more. (*See* page 10 above.) In addition to questioning Cepero about how far he was standing from the entrance of 932 Intervale Avenue, Dellicarri also asked Detective McKeon and Officer Santos to approximate this distance. Detective McKeon testified that the distance was about 109 feet. (*See* page 10 n. 11 above.) Even assuming that Officer Santos had meant to say feet instead of yards during his cross-examination testimony, he approximated Cepero's distance from the social club at 160 feet. (*See* page 10 above.) Medina claims that further investigation proved that the actual distance from the club's front door to the parking lot fence was 157.5 feet and thus to where Cepero was standing was "at least 160 feet away from the club's front door." (Medina C.P.L. § 440 Motion Ex. 7: Giretti Aff. ¶¶ 5–6.) The distance which the investigation would have determined, therefore, is not materially different from Officer Santos' testimony of 160 feet, which Dellicarri established on cross-examination and focused on during his closing argument. (*See* pages 9–10 above.) [FN43] In short, defense counsel developed at trial through cross-examination the very fact—Cepero's distance of 160 feet from the social club—that Medina claims he was ineffective for not hiring an investigator to establish. Dellicarri is not ineffective merely because the jury apparently chose to credit Cepero's testimony, despite impeachment as to his distance from the social club's front door.

> FN43. Indeed, the fact that an experienced lawyer like Dellicarri asked these questions

would seem to indicate that, unlike the lawyer in *Thomas v. Kuhlman,* Dellicarri had himself visited the scene of the crime.

**\*24** In addition, Medina has not met *Strickland'* s second, prejudice prong (*see* pages 43–44 above), that is, he has not shown that "but for the [supposed] deficiency, the likely outcome of the proceeding would have been different." *See, e.g., United States v. Miceli,* No. 00–1611, 7 Fed. Appx. 131, 133, 2001 WL 363504 at *1 (2d Cir. Apr. 12, 2001); Bingham v. Duncan, 01 Civ. 1371, 2003 WL 21360084 at *4 (S.D.N.Y. June 12, 2003) (based on review of the record the court found that "trial counsel's failure to do investigative work ... do [es] not establish that the result of the proceedings would have been different.").

3. *Counsel's Alleged Failure to Call a Potentially Exculpatory Witness*

Medina claims that his trial counsel should have called as a trial witness Mirca Martinez, [FN44] who was present in her nearby hair salon at the time of the incident. (Dkt. No. 1: Medina Br. at 15.) According to an interview conducted by the police on May 5, 1996, Martinez stated that "[she] did not hear a gunshot. [She] did see more than twenty men and women come running out of the place that night. The music that they play in the Club is very loud. It's loud enough so that [she] would not hear a gunshot." (Medina C.P.L. § 440 Motion Ex. 7: Police Report of Martinez Interview.)

> FN44. While Medina refers to this individual as Ms. Martinez (*see* Dkt. No. 1: Medina Br. at 15), Justice Fisch refers to her as Ms. Torres (*see* 10/22/03 Justice Fisch Order at 7).

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357 (1987); [FN45] *see, e.g., United States v. DeJesus,* No. 01–1479, 57 Fed. Appx. 474, 478, 2003 WL 193736 at *3 (2d Cir. Jan. 28, 2003) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

the sort engaged in by defense attorneys in almost every trial.' *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999). Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." Counsel's decision not to call a character witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses."), *cert. denied,* 123 S.Ct. 2110 (2003).[FN46]

> FN45. *Accord, e.g., Rodriguez v. Senkowski,* 03 Civ. 3314, 2004 WL 503451 at *41 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); *Gomez v. Duncan,* 02 Civ. 0846, 2004 WL 119360 at *31 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *25 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *37 (S.D.N.Y. June 17, 2003) (Peck, M.J.).

> FN46. *See also, e.g., United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), *cert. denied,* 123 S.Ct. 1949 (2003); *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998), *cert. denied,* 526 U.S. 1164, 119 S.Ct. 2059 (1999); *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.), *cert. denied,* 522 U.S. 846, 118 S.Ct. 130 (1997); *Nieves v. Kelly,* 990 F.Supp. 255, 263–64 (S.D.N.Y.1997) (Cote, D.J. & Peck, M.J.); *Rodriguez v. Mitchell,* 92 Civ.2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

More importantly, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation.... [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed ...,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." *Jones v. Hollins,* 884 F.Supp. 758, 765–66 (W.D.N.Y.1995) (citations omitted), *aff'd,* No. 95–2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); *accord, e.g., Rodriguez v. Senkowski,* 2004 WL 503451 at *41; *Gomez v. Duncan,* 2004 WL 119360 at *31; *Montalvo v. Annetts,* 2003 WL 22962504 at *26 ( & cases cited therein); *Skinner v. Duncan,* 2003 WL 21386032 at *37.

**\*25** In this case, Medina alleges that Martinez' testimony would have impeached the credibility of Cepero's testimony. (Dkt. No. 1: Medina Br. at 15.) According to Medina, if Martinez was unable to hear the gunshot, the jury might not believe that Cepero was able to hear the shot from a further distance away. (Medina Br. at 15.) Medina claims that this would be of particular importance because Cepero testified that the reason he had "looked up" and seen Medina hand off the gun was because he had heard a gunshot. (Dkt. No. 1: Farrell Aff. ¶ 5.) In addition, Medina states that his trial counsel should have called Martinez as a witness in order to determine whether Medina was one of the people she witnessed run past the store, and if so, whether or not he was carrying anything "shiny." (Medina Br. at 15.)[FN47]

> FN47. Of course, since the answers to these questions were not contained in the police interview statement, it would have been extremely risky—perhaps ineffective—for defense counsel to blindly ask these questions at trial. This itself was another good reason not to call Martinez as a defense witness.

Dellicarri stated that since the parties did not dispute the fact that Cardenas was killed by a bullet wound, Martinez's testimony, that she did not hear a gunshot, would not have discredited Cepero's testimony, but is a "red herring." (3/5/03 A.D.A. Markoe Aff. in Opp. to C.P.L. § 440 Motion Ex. 1: Dellicarri Aff. ¶ 32.) As Justice Fisch determined, "[t]he fact that [Martinez] may not have heard a shot does not necessarily establish that a shot was not fired or heard by another witness. It can hardly be argued that this testimony presents a strong probability that the outcome of the trial would have changed." (10/22/03 Justice Fisch Order at 7.) This is a classic issue of trial strategy and Dellicarri was not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

ineffective in his choice of strategy. Moreover, even assuming arguendo that Medina satisfied the first *Strickland* prong, the Court agrees with Justice Fisch that Medina has not shown a "reasonable probability" that Martinez's testimony concerning her inability to hear the shot would have changed the result of trial, and thus Medina has not satisfied the second *Strickland* prong, prejudice. *See, e.g., Mills v. Scully,* 826 F.2d 1192, 1197 (2d Cir.1987) (finding it was "sound trial strategy" and not "ineffective assistance of counsel" for trial counsel to forego use of contradictory testimony to impeach the trial testimony of the only eye witness to the shooting with which the defendant was charged.).

4. *Counsel's Alleged Failure to Properly Impeach Cepero*

Medina claims that Dellicarri did not properly impeach Cepero regarding statements Cepero had made during trial. (Dkt. No. 1: Medina Br. at 15–18.) Specifically, Medina claims that when Cepero incorrectly described Medina as being "in his thirties," Dellicarri should have more vigorously questioned him about this statement. (Medina Br. at 17.) In addition, Medina has a large tattoo prominently displayed across his back (Medina Br. at 16; *see also* Medina § 440 Aff. ¶ 10), but Cepero stated in a pre-trial statement that Medina did not have any tattoos. (Medina § 440 Motion Att.: Cepero Stmt. at 20; Medina Br. at 16.) Medina claims that the jury should have been made aware of this information and that Dellicarri should not have objected to the question posed by the Assistant District Attorney asking whether Cepero had ever seen Medina without clothing. (Medina Br. at 16.)

**\*26** Medina has failed to establish that Cepero's statements regarding Medina's age and tattoos were material since Cepero had known Medina for a year prior to the incident. Cepero's failure to properly guess Medina's age or notice his tattoos does not suggest that Cepero could not recognize Medina, who he had known for a year.[FN48] Moreover, it was a question of trial strategy as to how best to attack Cepero's ability to identify Medina; defense counsel focused on Cepero's distance, that he was high on crack and that he testified to obtain a favorable deal for himself,[FN49] rather than on discrepancies about Medina's age or whether he had a tattoo (the latter being an issue on which Cepero did not testify at trial). Such

issues of trial strategy are left to trial counsel and are not to be Monday morning quarterbacked under *Strickland. See, e.g., United States v. Jennings,* 01 Cr. 0164, 2002 WL 1402090 at \*4 (S.D.N.Y. June 28, 2002) ("Many, if not all, of [defendant's ineffective assistance] claims are latter day determinations that a different trial strategy might have been more effective, also known as Monday morning quarterbacking."), *aff'd,* No. 02–1411, 63 Fed. Appx. 35, 2003 WL 21105364 (2d Cir. May 14, 2003), *cert. denied,* 124 S.Ct. 2835 (2004); *Yanez v. Keane,* 16 F.Supp.2d 364, 375 (S.D.N.Y.1998) (Haight, D.J. & Peck, M.J.) (*"Strickland* instructs that hindsight does not convert a reasonable strategy into ineffective assistance."); *Rodriguez v. Hanslmaier,* 982 F.Supp. 279, 286–87 (S.D.N.Y.1997) (Sprizzo, D.J. & Peck, M.J.) (Petitioner's "habeas claim is based on an after-the-fact, Monday-morning quarterback approach.").

FN48. *Cf., e.g., Lee v. Keane,* No. 01–2136, 50 Fed. Appx. 497, 499, 2002 WL 31520115 at \*2 (2d Cir. Nov. 13, 2002) (The witness' "description of [petitioner] on the night of the shooting, however, was unequivocal—she knew [petitioner] from the neighborhood and had seen him in her building.... [S]he had the opportunity to observe him on numerous occasions at a distance of ten to twelve feet. At the lineup, [the witness] was able to identify [petitioner] within seconds. Finally, and most significantly, on the night of the shooting, she was able to identify Lee to the police, by name."), *cert. denied,* 124 S.Ct. 191 (2003); *United States v. Ming,* 02 Cr. 0596, 2002 WL 1949227 at \*1 (S.D.N.Y. Aug. 22, 2002) ("[T]he witness knew the defendant from prior encounters and identified him to the government by one of his aliases prior to the identification procedure, thus raising substantial doubt as to whether any suggestiveness of the procedure was undue."); *Poo v. Hood,* 89 Civ. 7874, 1992 WL 30617 at \*4 (S .D.N.Y. Feb. 12, 1992) ("That testimony could not be dismissed as a matter of mistaken identity because the witness clearly knew the defendant well and had seen him at close quarters in an elevator.").

FN49. Medina concedes that "[t]here is no

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

question that [defense] counsel sought to impeach Cepero's credibility concerning his criminal record and potential motive to ... curry favor for his own case." (Medina Br. at 15.)

Defense counsel Dellicarri vigorously and thoroughly pointed out a number of inconsistent statements made by Cepero throughout the course of trial. (*See* pages 8–9 above.) As stated by Justice Fisch:

A review of the trial record demonstrates that Cepero was vigorously cross examined in all relevant and material areas including his ability to see, his altered state of mind and his motivation for testifying. Mr. Dellicarri's cross-examination established testimonial inconsistencies bearing on the credibility of witnesses, which were then for the jury to consider.

(10/22/03 Justice Fisch Order at 6.) This Court has reviewed the entire trial transcript and agrees with Justice Fisch's conclusion that the cross-examination of Cepero was effective (albeit not sufficient to convince the jury to find Medina not guilty on all counts). Medina's claim of ineffective assistance of counsel should be *DENIED*.

IV. *MEDINA'S CLAIM OF ACTUAL INNOCENCE CANNOT BE REVIEWED ON FEDERAL HABEAS REVIEW*

Medina argues that Cepero's recantation on whether he could see a gun in Medina's hand constitutes newly discovered evidence that would likely have changed the verdict. (Dkt. No. 1: Medina Br. at 25 .)

Medina's "newly discovered evidence" claim goes only to his guilt or innocence, not to the constitutionality of his conviction. The Supreme Court has explained that "newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759 (1963); *accord, e.g., Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 860 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceeding."); *Galandreo v. Perlman,* No.02–CV–6799,

03–MISC–0066, 2003 WL 23198790 at *12, 20 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.) ("A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim.") (citing cases); *Jones v. Spitzer,* 01 Civ. 9754, 2003 WL 1563780 at *47 (S.D.N.Y. Mar. 26, 2003); *Jones v. Duncan,* 162 F.Supp.2d 204, 219–20 (S.D.N.Y.2001) (Peck, M.J.); *White v. Keane,* 51 F.Supp.2d 495, 502 (S.D.N.Y.1999); *Smithwick v. Walker,* 758 F.Supp. 178, 184 (S.D.N.Y.) ("Evidence which goes only to the guilt or innocence of petitioner is not sufficient to require habeas corpus relief."), *aff'd,* 948 F.2d 1278 (2d Cir.1991); *McCool v. New York State,* 29 F.Supp.2d 151, 160 (W.D.N.Y.1990) ("Newly discovered evidence relevant only to the guilt or innocence of the defendant is not sufficient to grant habeas relief.... For habeas relief to be available, the newly discovered evidence must bear on the constitutionality of the petitioner's conviction."); *Rodriguez v. Hoke,* 89 Civ. 7618, 1990 WL 91739 at *2 (S.D.N.Y. June 25, 1990); *Roberts v. LeFevre,* 88 Civ. 4114 1990 WL 6556 at *6 (S.D.N.Y. Jan. 22, 1990); *United States v. Coughlin,* 657 F.Supp. 433, 436 (S.D.N.Y.1987); *Mapp v. Clement,* 451 F.Supp. 505, 511 (S.D.N.Y .) ("[N]ewly discovered evidence only warrants habeas corpus relief where it bears on the 'constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state petitioner is not a ground for relief on federal habeas corpus' "), *aff'd mem.,* 591 F.2d 1330 (2d Cir.1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428 (1979).

*27 "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera v. Collins,* 506 U.S. at 400, 113 S.Ct. at 860 (citing cases). The "fundamental miscarriage of justice exception is available 'only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence." *Id.* at 404, 113 S.Ct. at 862 (quoting *Kuhlmann v.. Wilson,* 477 U.S. 436, 454, 106 S.Ct. 2616 2627 (1986)). It has never been extended to "freestanding claims of actual innocence." *Herrera v. Collins,* 506 U.S. at 404–05, 113 S.Ct. at 862–63.

Medina recognizes this principle (Medina Br. at 25),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

(Cite as: 2004 WL 2088578 (S.D.N.Y.))

but relies on *Ortega v. Duncan,* where habeas relief was granted on the basis that newly discovered evidence proved that a key witness's material testimony was false. *Ortega v. Duncan,* 333 F.3d 102, 108–09 (2d Cir.2003) ("[W]hen false testimony is provided by a government witness without the prosecution's knowledge, due process is violated 'only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." ' ") (quoting *United States v. Wallach,* 935 F.2d 45, 456 (2d Cir.1991)). Medina's case is distinguishable because it is not clear that Cepero's trial testimony was false.

Medina asserts that Cepero's alleged "recantation" on whether he could see a gun in Medina's hand constitutes newly discovered evidence showing that Medina is actually innocent. (Medina Br. at 25 .) At trial, Cepero testified that he saw in Medina's hands "a shiny object which appeared to be a gun." (Dkt. No. 5: State Br. at 18.) In a post-trial statement, Cepero allegedly repeated that he saw a "shiny object" in Medina's hands, but allegedly claimed that he was pressured by the police to say that the object was a gun. (State Br. at 18.) This supposed "newly discovered evidence" is an unsworn statement, rather than a sworn affirmation as required, and Medina cannot show that had it been presented, it would certainly have created a reasonable doubt as to his guilt. *See, e.g., Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 114 (2d Cir.) (To show actual innocence, "a petitioner must present 'new reliable evidence ... not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.' ") (quoting *Schlup v. Delo,* 513 U.S. 298, 299, 115 S.Ct. 851, 854 (1995)), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175 (2000); *accord, e.g., Elliott v. Kuhlmann,* 97 Civ. 2987, 2004 WL 806986 at *8 (S.D.N.Y. Apr. 9, 2004) ("To show 'actual innocence,' Petitioner must produce new, reliable evidence sufficient to make a 'colorable showing' that 'it is more likely than not that no reasonable juror would have convicted [Petitioner]' in light of the new evidence."). Cepero's trial testimony, stating the object "appeared" to be a gun, is not sufficiently different from his alleged "recantation." Under the deferential AEDPA review standard, this Court cannot say that Justice Fisch's decision denying this claim should

be set aside. Medina's habeas claim based on newly discovered evidence should be denied.

*CONCLUSION*

**\*28** For the reasons discussed above, Medina's habeas petition should be *DENIED,* and a certificate of appealability should not issue.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2004.

Medina v. McGinnis
Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.